WILLAMETTE INDUSTRIES, INC., Petitioner v. Commissioner of INTERNAL REVENUE, Respondent
Willamette Industries, Inc. v. Commissioner
Docket Nos. 13440-78; 16313-79; 21473-81.
United States Tax Court
T.C. Memo 1987-479; 1987 Tax Ct. Memo LEXIS 475; 54 T.C.M. (CCH) 616; T.C.M. (RIA) 87479; September 22, 1987; As Amended October 20, 1987 Charles P. Duffy and Philip N. Jones, for the petitioner. Gerald J. Beaudoin, Martin Cohen, and R. B. Miscavich, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: These cases were assigned to Special Trial Judge Hu S. Vandervort pursuant to section 7456(d) (redesignated section 7443A(b) by the Tax Reform Act of 1986, Pub. L. 99-514, section 1556, 100 Stat. 2755), and Rules 180, 181 and 183. [1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE VANDERVORT, Special Trial Judge: In these consolidated cases, respondent determined the following deficiencies in Federal income taxes: Year
Deficiency
1974
$ 4,715,178
1975
3,605,287
1976
4,656,977
1977
4,274,101
As a result of petitioner's second amendment to the petitions filed in each of these consolidated cases, petitioner *477 requests the Court to find overassessments for each of the years in issue in the following amounts: Year
Overassessment
1974
$ 3,350,803.00
1975
2,144,145.00
1976
2,144,032.00
1977
1,509,543.00
After concessions by the parties the issue before the Court is the determination of the fair market value, as of the first day of each taxable year, of eligible timber cut by petitioner in Oregon and in Louisiana pursuant to its election to treat the cutting of timber as a sale or exchange within the meaning of section 631(a). [2]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated by this reference. At all relevant times, petitioner Willamette Industries, Inc., (Willamette) was an Oregon corporation engaged in forest management, logging, and production of various wood products and kraft paper. At the time the petitions in these cases were filed, Willamette's principal office was located in Portland, *478 Oregon. Petitioner filed timely consolidated income tax returns (including Form T, Forest Industries Schedule) for the calendar years 1974 through 1977 with the District Director of Internal Revenue in Portland, Oregon. During the years indicated in the petitions, petitioner's consolidated returns included the income of the following subsidiaries: Louisiana Plywood Corporation (1977); Hunt Lumber Company, Inc. (1974); Western Kraft East, Inc. (1974-1977); Wimer Logging Company (1974-1977); Wimer Trucking Company (1974-1977); Duraflake South, Inc. (January 1, 1974 - April 23, 1977); Santiam Southern Company (1974-1977); Lebanon Lumber Company (April 1, 1974 - April 2, 1974); Wilmar Plywood, Inc. (June 29, 1974 - December 31, 1974); Bend-Willamette Corporation (June 2, 1977 - December 31, 1977); and Mobol Products, Inc. (June 2, 1977 - December 31, 1977). The books of Willamette and its subsidiaries are maintained on a calendar year basis using the accrual method of accounting. During the years 1974 through 1977, a section 631(a) election [3] was properly in effect for Willamette and its subsidiaries engaged in logging. *479 Beginning in 1959 and continuing through the years in question, petitioner and Freres Lumber Company, Inc. were engaged as equal joint venturers in logging and manufacturing veneer under the name of Freres Veneer Company (Freres). Prior to the year 1974 Freres made the appropriate election to treat the cutting of timber by it as a sale or exchange under the provisions of section 631(a). Freres filed timely partnership returns for the taxable years 1974 through 1977. On May 21, 1981, Willamette filed a timely amended consolidated income tax return for the year 1976, claiming a refund in the amount of $ 781,389.00. This claim was based upon an increase in the claimed fair market value of eligible timber cut by Freres in 1976. At the same time, Willamette filed a timely amended consolidated income tax return for the year 1977, claiming a refund in the amount of $ 152,007.00. This claim was based upon an increase in the claimed fair market value of eligible timber cut by Willamette and Santiam Southern Company during 1977. The timber cut by Willamette and its logging subsidiaries and in the joint venture with Freres was located primarily in northern Louisiana[4] and in Oregon. *480 Inasmuch as there are regional differences between Louisiana and Oregon we will discuss the facts relating to these two areas separately. However, there are some findings which relate to both Louisiana and Oregon. During the 1970's the price of timber was on a general upswing with steep rises occurring from the end of 1972 to the middle of 1974. Specifically, prices for Oregon stumpage were at a high in mid-1974 with some fluctuation up and down until 1977. Therefore, the increase in price during the years 1974 through 1977 was not as accelerated as the post-1977 years and the jump in prices preceding 1974. During the years at issue, inflation was also on the rise. Various factors combined to cause the upward price movement in the timber industry during the 1970's. The two primary factors pushing prices upward were the projected increased housing demand for the late 1970's and the existence of environmental restrictions. Both factors appeared to indicate that there would be a shortage in *481 available timber. We find that the interest rate applied to timber cutting contracts during the years 1974, 1975, 1976 and 1977 was 8 percent. This interest rate represents the average cost of borrowing for the timber interest during the years involved. LOUISIANA
During the years in question, petitioner cut Louisiana timber eligible for section 631(a) treatment in the following respective amounts. Eligible Timber Harvested - Louisiana
Sawtimber Volume
Pulpwood Volume
Year
[5](MBF) [6](Cord) 1974
46,919.809
12,080
1975
51,267.530
10,789
1976
51,650.005
8,697 1977
64,558.368
10,518
The southern headquarters of Willamette and its related southern companies is located in Ruston, Louisiana. In the market area in which the subject Louisiana timber is located, approximately 66 percent of the commercial forest land is held by *482 non-industrial private forest land owners. Forest industries are the next largest timberland owners with approximately 23 percent. The remaining land (approximately 10 percent) is owned by the United States Forest Service (USFS) along with other public agencies. The sources of the eligible timber cut by petitioner's Louisiana corporations were from lands owned by petitioner (fee lands), industry cutting contracts (Continental Can Company, Inc., Crown Zellerbach and Roy O. Martin), USFS timber cutting contracts and private timber cutting contracts. Timber cut pursuant to USFS timber cutting contracts represents approximately 15 percent of the stumpage volume marketed annually by Willamette in Louisiana. Although private sales represent the majority of stumpage purchased in the subject area, information regarding those sales is difficult to acquire, while the USFS sales information is publicly available. Sales of timber by the USFS in Louisiana involve selected timber on National Forest lands administered by the USFS. USFS timber sale contracts are awarded by bid, either at oral or sealed bid auction. Before the actual sale, the USFS mails a Timber Sale Prospectus to potential *483 bidders giving them preliminary information on an impending timber sale. The prospectus contains information concerning the location of the sale area, a description of the timber, estimated volume of the timber and logging requirements. The volume reflected in the prospectus is the same volume reflected in the cruise, which takes place six to nine months prior to the actual sale date. [7]
On the bid date, due to growth, the actual volume of timber under the contract is greater than the cruise volume. Between the cruise date *484 and the actual bid date, growth takes place at a rate of 7 percent a year. [8] Between the bid date and the time the successful bidder begins to cut the timber, there is also growth at a rate of 7 percent per year. The Forest Service does not adjust the cruise data volume to reflect this 7 percent increase. In arriving at an estimated volume from the cruise, in Louisiana the Forest Service uses a scaling method of measurement known as the Scribner Decimal C Scale (Scribner Scale). This scale is different than the scaling method used by the State of Louisiana, Willamette and most other private concerns. The latter uses a modified Doyle Scale (Doyle Scale). Both of these systems attempt to estimate the volume of a log available for lumber manufacturing, but the Scribner Scale results in a higher estimated volume from a given log than does the Doyle Scale. The resulting volume from the Doyle Scale is 20.4 percent less than the volume estimated by using the *485 Scribner Scale. Upon the award of the contract, the successful bidder is required to submit a bid deposit of approximately 5 percent of the total bid price. The deposit may be in the form of a bid bond, negotiable securities or cash. Risk of loss and title do not pass upon the award of the contract. It is not until the purchaser cuts, scales, and removes the timber from the scale area that risk of loss and title shift over from the USFS. The cutting contract, however, is binding upon the purchaser at the time of execution. In Louisiana, the USFS contract requires the timber tract to be divided into payment units called compartments or cutting units. Payment for one or more cutting units or compartments is required upon notification by the purchaser of that company's intention to cut the unit. Most LouisianaUSFS timber cutting contracts have a term of three years. Therefore, the purchaser may harvest the timber according to particular production needs anytime during the contract period. On the average, in the two years following the bid date, only one-half of the timber is harvested on such contracts while one-half of the timber remains. As previously stated, one of *486 the primary sources from which petitioner and its consolidated subsidiaries (Santiam Southern, Louisiana Plywood Corporation and Hunt) cut eligible timber is the industry holdings. Specifically, the largest source of such timber during 1974 through 1977 was the Continental Can Company (CCC) timber. Unlike the USFS timber, the CCC timber is cut on a clear-cut basis in which all of the trees on a given tract are harvested. USFS timber is harvested on a selective cutting basis during which only designated trees are cut. Clear-cutting is ordinarily less expensive than selective cutting if reforestation costs are not present. Like most non-government contracts, the CCC contracts did not require the buyer to reforest or clean-up the harvested areas. The timber located on the CCC land contained more volume of wood per acre than the USFS timber cut by Willamette. All of the Louisiana timber harvested by Willamette and its related companies went to supply their processing facilities located in the northern Louisiana area. The timber utilized in each mill or processing plant comes from the surrounding geographic area. The supply of timber for each facility is dependent upon such factors *487 as the availability of timber in that area, competition for the purchase of the timber and the cost of transporting the timber to the facility. Petitioner's Louisiana facilities were located in Ruston, Dodson, Minden, Campti, Zwolle, Columbia and Danville. The following are the fair market values asserted by petitioner and respondent for the eligible Louisiana timber harvested in the years 1974 through 1977: Fair Market Values as of January 1, 1974
Pine
Hardwood
Pine
Hardwood
Sawtimber
Sawtimber
Pulpwood
Pulpwood
FMV/MBF
FMV/MBF
FMV/Cord
FMV/Cord
Petr. $ 180.57
$ 53.10
$ 7.00
$ 2.50
Resp. 122.42  44.20  7.00  2.50  [9] Fair Market Values as of June 29, 1974 Pine
Hardwood
Pine
Hardwood
Sawtimber
Sawtimber
Pulpwood
Pulpwood
FMV/MBF
FMV/MBF
FMV/Cord
FMV/Cord
Petr. $ 152.01
$ 57.09
$ 7.25
$ 3.00
Resp. 110.00  54.00  7.25  3.00  Fair Market Values as of January 1, 1975
Pine
Hardwood
Pine
Hardwood
Sawtimber
Sawtimber
Pulpwood
Pulpwood
FMV/MBF
FMV/MBF
FMV/Cord
FMV/Cord
Petr. $ 129.39
$ 55.53
$ 7.50
$ 3.50
Resp. 100.10  55.53  7.50  3.50  *488 Fair Market Values as of January 1, 1976
Pine
Hardwood
Pine
Hardwood
Sawtimber
Sawtimber
Pulpwood
Pulpwood
FMV/MBF
FMV/MBF
FMV/Cord
FMV/Cord
Petr. $ 150.11
$ 52.15
$ 7.50
$ 3.50
Resp. 107.98  52.15  7.50  3.50  Fair Market Values as of January 1, 1977
Pine
Hardwood
Pine
Hardwood
Sawtimber
Sawtimber
Pulpwood
Pulpwood
FMV/MBF
FMV/MBF
FMV/Cord
FMV/Cord
Petr. $ 166.30
$ 46.10
$ 8.50
$ 3.50
Resp. 136.80  46.10  8.50  3.50  OREGON During the years in question, petitioner and Freres cut Oregon timber eligible for section 631(a) treatment in the following respective amounts: Freres
Year
Volume (MBF)
1974
40,051.080
1975
39,015.310
1976
40,568.930
1977
26,190.590
Willamette
Year
Volume (MBF)
1974
312,411.209
1975
317,537.104
1976
309,646.240
1977
288,307.946
The timber was harvested by Willamette and Freres from the Cascade Range Mountains and the Coast Range Mountains of Western Oregon, running north from the area surrounding Eugene, Oregon, to Portland, Oregon. The primary operating areas of Willamette and Freres *489 may be divided into two areas, the Coast Range and the West Cascades. The operating areas in the Coast Range are the Trask area in the north, the Black Rock area in the middle, and the Alsea are in the south. On the Cascade side, east of the Willamette Valley, petitioner's primary areas were the Molalla and North Santiam areas in the north, the south Santiam and Snow Peak areas in the middle, and the Springfield and Mohawk area in the south. From these areas, the principal species cut by petitioner were Douglas-Fir (approximately 70-75 percent of the subject volumes), whitewoods (approximately 20-25 percent of the subject volumes). A very small amount of pine and hardwood was also cut by petitioner. In addition to these various types of timber, a much less valuable category of subject timber was harvested by Willamette called special scale. The special scale timber is segregated from other merchantable timber due to size, species, defects or quality. This category includes Per Acre Material [10] (PAM), hardwood PAM, special fir, cull and utility logs. *490 The sources of the timber cut by petitioner are USFS sales, Bureau of Land Management (BLM) sales, timber located on land owned by the Lewis W. and Maud Hill Family Foundation and the Hill Foundation Company (the Hill interests), Willamette's own fee timber and various private and public sources (the Avery and Holland interests, the Weyerhaeuser Company, the State of Oregon, and the cities of Corvallis and McMinnville). The fee and private and public sources comprise about 50 percent of the subject timber cut by Willamette. One of the private sources of timber is the Hill interests. In 1946, the predecessors of Willamette entered into long-term contracts to harvest timber located on land in northern Oregon owned by the Hill interests. The Hill interests land is located in the South Santiam operating area. Williamette properly adjusted the Hill production volumes to a usage basis. [11]
The USFS Oregon timber to be valued is located in the West Cascade operating area and in the North and *491 South Santiam areas of the Willamette National Forest. USFS timber in Oregon is sold at auction to the highest bidder who bids at a rate per MBF (unlike USFS timber sales in Louisiana). The ultimate purchase price is then determined on a recovery basis. The USFS cruises the timber to estimate the value, volume, and quality of the timber tracts which are to be offered for sale. Once a sale area is defined, the USFS prepares an appraisal of the estimated value of the timber in that area by species (Douglas Fir, Whitewoods, or Cedars) and grade (quality). Appraisal estimates are reported in terms of dollars per MBF. This appraisal information is then sent to prospective bidders in the form of a Timber Sales Prospectus. Parties interested in bidding on a particular sale must submit qualifying bids to become participants in the oral auction. A qualifying bid is a bid which is equal to the minimum price set by the USFS in its prospectus. Once the qualifying bids are identified the bidders are invited to participate in the oral auction at which the successful bidder is determined. During the years in issue, the competition at these bid auctions was great, with an auction lasting *492 anywhere from minutes to hours. The OregonUSFS cutting contracts differ from LouisianaUSFS cutting contracts in that the purchaser of timber must construct logging roads on the tract of timber purchased, in order to gain access to the timber during the harvest process. The purchaser receives a credit per MBF against the price of the timber harvested (purchaser road credit), at a rate specified in the contract, for the construction of the roads. The credit rate is based on USFS estimates of logging road costs derived from rates in prior years. This figure is not based on actual road construction costs. The credit is applied pro rata to the required contract payments for the timber. As a result of the presence of road credits there is particular terminology used for the different bid prices in an OregonUSFS sales contract. The "high bid" represents the total amount of the bid and includes the road credit. The "statistical high bid" is the "high bid" less the road credits. Under a USFS timber sale, the successful bidder enters into the contract with the USFS and is given the right to cut and remove the timber for a period of three to five years in length with cutting *493 taking place over the term of the contract. (Usually, 10-15 percent is cut in the first year). Payment is not required until the timber has been cut, scaled, and removed from the timber tract. Once the harvested volume is determined, the successful bidder pays the amount that was bid per MBF, on the volume of the timber harvested, minus the purchaser road credit. Only after the timber is cut, scaled and removed, does title and risk of loss pass from the USFS to the purchaser. Although the payment under the USFS contract does not take place until the timber is actually harvested, the successful bidder at an auction is required to furnish a performance bond and a payment guarantee. This guarantee may be in the form of a surety bond, cash deposit or negotiable securities. If securities are used as a bid deposit, the successful bidder earns the income on the securities. The actual amount in dollar terms that a successful bidder must deposit is de minimis relative to the total bid price for the contract (bid deposits were approximately two to five percent of the total bid price in the years 1974-1977). In addition, these USFS contracts contain several environmental restrictions *494 and reforestation requirements that are not present in private contracts. After the timber has been harvested, it must be scaled. Scaling is the measuring of the logs to determine their volume. There are three methods of scaling used by the timber industry; land or roll-out scale, truck-scale and water-scale. Water-scale is considered to be the least accurate measure of merchantable volume while land-scale is considered to be the most accurate. When logs are being land-scaled they are placed on a flat surface so that the scaler can roll the log to get a view of the entire log for measurement purposes. In truck-scaling, the logs remain tied to the truck so the scaler is only able to view those surfaces which are facing outward or not against other logs. However, the scaler is able to measure the diameter on both ends of the log during a truck-scale. During water-scale measurement procedures, logs float in a log pond after being rafted together so that the scaler may walk on the logs. A water-scaler uses a special stick to measure the diameter of the small end of the log. In water-scaling, only the small end diameter measurement is taken, in comparison to roll-out and truck-scaling *495 where a measurement is taken of both ends of the log. In reporting its subject log volume figures, petitioner used water-scale for a small portion of its log volume. All comparable sales data used by petitioner's timber valuation experts were, however, in land-scale or truck-scale. The comparable sales data does not include water-scale volumes because the Forest Service did not accept water-scale figures during the years 1974-1977. In order to compensate for the inaccuracies of water-scaling this small portion of subject timber, Willamette adjusted the log volumes from water-scale to land-scale by a factor of 8 percent. The 8 percent adjustment was made because water-scaling results in a smaller estimated volume on a given log. (In addition, log defects are accentuated by the water). The fact that water-scale is the least accurate of the three methods of scaling is generally accepted in the timber industry and very few, if any, log ponds continued to be operated today. The BLM, a division of the Department of the Interior, also sells timber to Willamette on the lands that it administers. These BLM contracts are different than the USFS contracts in that they are sold on *496 a lump-sum basis. This means that the purchaser must pay the total bid price regardless of the actual volume eventually harvested. The purchaser is required to pay a total purchase price not later than the expiration of the time of cutting and removal. Therefore, unless an extension is granted at the total price must at least be paid by the end of the term of the contract. In determining what the estimated bid price should be on a BLM sales contract, the BLM makes a cruise of the timber tract to be sold. When cruising, the BLM uses Board Foot Volume Tables for 16-foot logs. The Forest Service and most private concerns used volume tables based on 32-foot logs. The 16-foot "short log" volume table used by the BLM produces a higher estimated volume than the 32-foot "long log" volume table. The difference between the two methods is approximately 18 percent and is attributable to allowances for taper, defects and percentage of merchantable wood. Therefore, a downward adjustment of 18 percent is required. The BLM, similar to the USFS, requires a bid deposit which is a percentage of the total purchase price. This bid deposit is required to be paid on or before the date the contract *497 is signed by the purchaser. In addition, there is a performance bond of approximately five percent that must also be posted. Once the bid deposit has been made, the payment provisions of the BLM contract require that the purchaser pay for the timber prior to cutting it. Since the sale is divided into sections, the purchaser pays for each section as plans are being made to cut that section. There is no particular schedule for cutting on the BLM contracts, therefore the timing of the harvest is left to he individual purchaser. Most BLM contracts were three years in length during 1974 through 1977. Pursuant to the provisions of the BLM contract, title to the timber and risk of loss do not pass to the purchaser until the timber is paid for and removed from the contract areas. However, as previously noted, the risk of cut rests with the purchaser in a BLM contract. This is due to the fact that if the BLM estimates that there are ten thousand board feet of timber on a certain tract, but only eight thousand are actually cut out, the purchaser must still pay for the ten thousand board feet. This is in contrast to the USFSOregon contracts where the bid is based on a dollar amount *498 per MBF cut and the purchaser only pays for as much volume as is actually cut out of the tract. Because of this difference in the USFS sales contracts and the BLM sales contracts, Willamette generally cruises a BLM sale prior to bidding, but does not cruise a USFS sale prior to the bid. In addition to the BLM and USFS sales, there were a number of private sales of Oregon timber. This private timber, unlike the government managed timber, is eligible for export into the international timber market. Generally, timber headed into the international markets commands a higher price because only the best quality timber is selected for export. On March 23, 1974, the United States Government published regulations in the Federal Register entitled "Timber Export and Substitution Restrictions". These were to become known as the "Anti-substitution Regulations" (Regulations). 39 Fed. Reg. 9663 (1974). [12] The Regulations permitted purchasers of USFS timber in 1974, and the years following, to purchase up to 110 percent of their historical National Forest purchases and, at the same time, export private timber up to 110 percent of their historical record, without being in violation *499 of the Regulations. See 36 C.F.R. sec. 221.25(e) (1974). The historical record of National Forest purchases refers to a base period made of the years 1971, 1972 and 1973. A particular purchaser's historical record, of both private timber exported (historical export base) and National Forest timber purchased from a particular tributary area, is used as a basis to determine whether and to what extent, in subsequent years, private timber could be exported and National Forest timber could be purchased. [13]
*500 There were two ways that a company could find itself in violation of the Regulations. One way was to violate the Regulations by means of a direct export. Direct export was when a company, while purchasing or cutting USFS timber, sold private timber in excess of its 110 percent limit directly to an exporter. The second way to violate the Regulations was by indirect export. Indirect export occurs when a company, while purchasing or cutting USFS timber, sells its private timber to a third-party who is not subject to the Regulations and that timber finds its way into the export market. While the Regulations set out parameters within which no violation of the export rules would occur, it appears that USFS did not actively pursue any violations. A violation could bring debarment from purchasing or bidding on USFS timber for a period of three months to one year. The debarment period could not exceed one year. In addition to the apparent non-active enforcement of the Regulations, there are various exceptions to the Regulations. One exception is as follows: No violation occurs where the land and timber are sold for the export market by a company that has no historical export base. *501 Yet that company is free to continue to bid on USFS contracts, while exporting in excess of 110 percent of the historical export base. Another exception: if a company were in violation of the Regulations, it could purify itself by discontinuing USFS purchases. After that, the company could freely export. OPINION Under section 631(a) [14], a taxpayer may elect to treat the actual cutting of timber as though it were a hypothetical sale or exchange of that timber and, therefore a taxable event. The resulting gain or loss will then qualify for section 1231 capital gain or ordinary loss treatment, provided the required holding period is met. The capital gain or loss recognized by the taxpayer is an amount equal to the fair market value of the timber as of the first days of the taxable year in which the timber is cut, less the taxpayer's adjusted basis for depletion of the timber. *502 At issue in this case is the fair market value of the timber eligible for section 631(a) treatment as of January 1, 1974, June 29, 1974, [15] January 1, 1975, January 1, 1976, and January 1, 1977, and cut by Williamette during those years. Accordingly, although at issue is the fair market value of the timber eligible for section 631(a) treatment, there are various sub-issues within the general fair market value issue that the parties have not been able to resolve. The sub-issues are: (1) whether the CCC timber is equal to the value of the USFS timber in Louisiana: (2) whether there should be an adjustment for growth between the time of the cruise date and the bid date, and the bid date and the cut date in the Louisiana timber; (3) whether petitioner properly adjusted its volumes of Oregon timber to reflect the use of waterscale on that portion of the timber; (4) whether the comparable sales values of private timber in Oregon should take into account the export market values which are higher than the domestic market values; (5) whether the fair market value of comparable sales *503 of Oregon timber should be the "high bid" or the "statistical high" bid, thereby leaving in the purchaser road credit or taking out the purchaser road credit from the bid price; and, (6) whether the bid prices on both USFS Louisiana and Oregon timber are cash or cash equivalents or whether they need to be discounted to become a cash equivalent for the purpose of the section 631(a) valuation. The resolution of these issues will help determine the fair market value of the eligible timber in this case. Before we begin to answer the various sub-issues set forth above, there are some general observations about the presentation of these consolidated cases which we are compelled to make. In determining the fair market value of petitioner's timber, we have been aided (and many times hindered) by the testimony of 18 witnesses for respondent and 8 witnesses for petitioner. Needless to say, the Court was presented with an abundance of information on a question which is better left to resolution by the parties themselves. Buffalo Tool and Die Manufacturing Co. v. Commissioner,74 T.C. 441, 451-452 (1980). See also Willamette Industries, Inc. v. Commissioner,T.C. Memo 1980-577. *504 Most unhappily, we note that even though the parties litigated this very same issue in this Court for the three prior years, they are once again unable to come up with a workable solution to their problems. The parties themselves are the ones best equipped to provide the many factual answers which lay within the grasp of the timber industry and the Internal Revenue Service with regard to the taxation of the petitioner's logging operations. Perhaps the parties' stubborn positions were conveyed to their experts, as well. During the trial of these cases, we were most troubled by the fact that expert testimony, in some instances, focused on deriding and degrading the opposing experts, rather than on the substance of the issues involved. A comment by one of respondent's economic experts directed at the various timber industry officials labeling them as members of the "flat earth society" was hardly helpful and certainly not persuasive. An overabundance of expert information in this case tended to cloud or confuse the issues rather than to help answer the questions raised by the parties. In looking at the assistance given the Court by the various witnesses and experts, we feel *505 that we were most appreciative and gave most weight to those individuals actually involved in the day-to-day operations of the timber industry. Clearly, we were more persuaded by the testimony of those who actually saw the timber in question before it was cut. When arriving at fair market values, it is generally necessary that one view or have actual knowledge of the item which is being valued. The many reports and pages of testimony were studied by this Court in arriving at our determination. However, to comment specifically on each and every expert would make an already lengthy opinion into an oppressive time. Where it is pertinent, we refer to or discuss the reports and testimony before the Court. However, as we embark on this monumental journey through the timberlands of Louisiana and Oregon, once again, we strongly suggest that valuation issues such as are present in this case, be reasonably negotiated and settled by the parties. Before we address the issue of the timber's fair market value, we turn our attention to one preliminary matter. Petitioner contends that respondent is collaterally estopped from relitigating these and other issues in the present cases. We *506 disagree. The doctrine of collateral estoppel precludes relitigation of any issue of fact or law that is actually litigated and necessarily determined by a valid and final judgment. Montana v. United States,440 U.S. 147, 153 (1979); Wright v. Commissioner,84 T.C. 636, 639 (1985). Its purpose is to avoid repetitious litigation of issues between the same parties or their privies. See Jaggard v. Commissioner,76 T.C. 222, 223 (1981). Collateral estoppel must "be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged." Commissioner v. Sunne,333 U.S. 591, 599-600 (1948). "If the relevant facts in the two cases are separable, even though they may be similar or identical, collateral estoppel does not govern the legal issues which recur in the second case." Commissioner v. Sunnen, supra at 601, citing Stoddard v. Commissioner,141 F.2d 76, 80 (2d Cir. 1944). Petitioner seeks to estop respondent from litigating several matters *507 involved in Willamette Industries, Inc. v. Commissioner,T.C. Memo. 1980-577. The applicability of collateral estoppel to those matters was the subject of petitioner's motion for partial summary judgment. The motion was denied in an Order supported by a Memorandum Sur Order dated April 20, 1983.[16] Petitioner, nevertheless, persists in asserting the doctrine of collateral estoppel. This opinion reflects our earlier denial. Petitioner further contends that respondent is collaterally estopped from litigating the validity of the "Dowdle discount theory," claiming that respondent has litigated and lost the issue in two previous cases to which petitioner was not a party. See Peek v. Commissioner,T.C. Memo. 1983-224, and Potlatch Corp. v. United States,548 F. Supp. 155 (N.D. Cal. 1982). *508 It is well established, however, that collateral estoppel may not be invoked against the Government by one who was not a party to the prior proceeding. United States v. Mendoza,464 U.S. 154 (1984); Black Construction Corp. v. Immigration and Naturalization Service,746 F.2d 503, 504 (9th Cir. 1984); McQuade v. Commissioner,84 T.C. 137, 144-145 (1985). In Mendoza, the Supreme Court recognized that "the Government is not in a position identical to that of a private litigant * * * both because of the geographic breadth of Government litigation and also, most importantly, because of the nature of the issues the Government litigates." United States v. Mendoza, supra at 159. Accordingly, the Court limited the application of nonmutual collateral estoppel to private litigants. To hold otherwise would impose on the Government the onerous burden of appealing every holding with which it does not agree. This would substantially "thwart the development of important questions of law by freezing the first final decision" in a particular case. United States v. Mendoza, supra at 160; McQuade v. Commissioner, supra at 144. *509 Since Willamette was a party in neither the Peek case nor the Potlatch case, it cannot assert collateral estoppel against the respondent concerning issues decided therein. Consequently, we need not address the issue of whether the validity of the Dowdle discount theory was actually litigated and necessarily determined in those prior actions. We now turn to the matter of determining the fair market value of eligible timber. In making the determination of the fair market value of timber eligible for section 631(a) treatment, we look to the traditional fair market value formula. Fair market value is determined by looking at the price at which the timber would be sold in a hypothetical transaction between a willing buyer and a willing seller, neither being under any compulsion to sell or buy, and both having the most reliable and accurate information available as of the valuation date. Sec. 1.631-1(d)(2), Income Tax Regs.; Willamette Industries, Inc. v. United States,689 F.2d 865 (9th Cir. 1982), affg. 530 F. Supp. 904 (D. Or. 1981), cert. denied 460 U.S. 1052 (1983); Buse v. Commissioner,71 T.C. 1129 (1979); *510 Pope & Talbot, Inc. v. Commissioner,60 T.C. 74, 77, (1973), affd. per curiam 515 F.2d 155 (9th Cir. 1975); Cascade Lumber Co. v. Squire, an unreported case ( W.D. Wash. 1957, 52 AFTR 1290, 57-2 USTC par. 9841). In arriving at the fair market value, consideration must be given to all factors that would affect the selling price of the timber in the marketplace. The factors which deserve our attention are character, quality and quantity of the timber, location of the timber in relationship to sawmills, accessibility of the timber, actual sales prices in transactions involving similar timber and disinterested appraisals made through the use of approved methods. Section 1.611-3(f), Income Tax Regs.
The best indication of the fair market value of timber for section 631(a) purposes is the comparable sales method of valuation. Under this method, values from contemporary sales of comparable timber are obtained in the same geographical area as the cut timber. The comparable sale timber must be of like species, quality, quantity, etc., to be considered a valid comparable sale. See Rogers v. Commissioner,T.C. Memo. 1983-420; *511 Lysek v. Commissioner,T.C. Memo. 1975-293, affd. 583 F.2d 1088 (9th Cir. 1978). As we have stated before "where possible, use of the comparable method rather than the conversion return method of calculating value is the better approach." Buse v. Commissioner,71 T.C. at 1136-1137. Although the conversion return method is generally an easier valuation method, it does not produce the best results. For example, USFS sales prices are usually in excess of USFS appraisals, which are based on a conversion return method. More significantly, however is the fact that the method may produce a value below a comparable sales value, especially in an inflationary economy such as that in the years 1974 through 1977. Therefore, we find that the most accurate method of valuation is the comparable sales methodology. Once the comparable sales are selected, each sale must be individually adjusted to reflect equivalent quality, quantity, accessibility and location. Buse v. Commissioner,71 T.C. at 1129. Specific adjustment issues have arisen in these consolidated cases.
1. Continental Can Timber
Petitioner and respondent *512 are at "loggerheads" over the issue of whether the CCC timber is at least equal in value to the USFS timber cut in Louisiana during the years 1974 through 1977. This timber represents one of the primary sources of timber for Willamette in Louisiana. We have looked at all the factors presented by the parties impacting on the question of relative value of CCC timber as compared to the USFS timber and have found that the CCC timber is at least equal in value to the USFS timber. While the various experts' testimony on this issue was contradictory, a preponderance of the evidence supports our finding. Although the USFS Louisiana timber has a larger individual log volume than does the CCC timber, the ability of Willamette to clear cut the CCC timber adds to the value of the timber by way of reduced logging costs. Other costs of harvesting are also decreased for Willamette on the CCC timber because all of the government "red-tape" found in a USFS contract is not present in the private CCC contract. In addition, the fact that CCC timber has more volume per acre than USFS timber further convinces us that the value of the CCC timber can only be favorably impacted thereby. Thus, because *513 CCC timber is at least equal in value to USFS timber, comparable sales of USFS timber can be used in determining the fair market value of CCC timber. After all, "it is the character of the timber to be valued, not the identity of the seller, which determines appropriate comparable sales of timber." Willamette Industries, Inc. v. Commissioner,T.C. Memo. 1980-577. [17]
2. Adjustment For Growth
This issue affects only the Louisiana timber. The parties are in disagreement over whether the comparable sales of USFS timber should be adjusted for growth that occurred between the cruise date and the bid date and, between the bid date and the harvest date. Respondent's Louisiana *514 appraisal experts made this adjustment while petitioner's appraisal experts did not. Growth occurs at a rate of 7 percent per year on the Louisiana timber with the growing period taking place primarily between March 15 to November 15. However, it is also apparent that growth takes place in all circumstances under all contracts, (whether BLM, USFS, CCC or private) between the cruise and the bid and, between the bid and the harvest. Because USFS contracts in Louisiana are cut out on a compartment or unit basis, the growth insures to the benefit of the purchaser. In other words, before the purchaser begins to cut an individual unit or compartment on a USFS tract, he must pay the bid price for that unit based on the volume determined from the cruise (which takes place approximately 6 to 9 months before the bid date). Therefore, any growth from the time of the cruise to the time of the cut is a bonus to the purchaser. One of respondent's Louisiana experts, who was formerly the Plans and Operations Forester for Weyerhaeuser, stated that the USFS Louisiana sales did provide the benefit of the additional growth to the purchaser. Because he had been involved in the actual bidding process, *515 we find his testimony in this area to be credible and quite helpful in making our determination. Petitioner's experts did not satisfactorily explain why such an adjustment should not be made. We are guided by the regulations to consider all information impacting on fair market value that is within the grasp of the willing buyer and willing seller. Section 1.631-1(d)(2), Income Tax Regs., states: (2) The fair market value of the timber as of the first day of the taxable year in which such timber is cut shall be determined, subject to approval or revision by the district director upon examination of the taxpayer's return, by the taxpayer in the light of the most reliable and accurate information available with reference to the condition of the property as it existed at the date, regardless of all subsequent changes, such as changes in surrounding circumstances, methods of exploitation, degree of utilization, etc. The value sought will be the selling price, assuming a transfer between a willing seller and a willing buyer as of that particular day. * * * [Emphasis supplied.] Therefore, inasmuch as the timber grew at a rate of 7 percent annually, *516 an adjustment is clearly necessary to account for the growth which took place between the cruise date and the valuation date for section 631(a) purposes.
3. Water-Scale
During the years in issue, Willamette scaled a small portion of its Oregon logs using the water-scale method. The majority of scaling, however, was carried out by truck-scale or land-scale. Of the three scaling methods, water scale is the least accurate, resulting in an 8 percent lower volume than the truck-scale or land-scale. Because of this 8 percent differential, Willamette seeks to adjust upward the volume of those logs which were water-scaled during the year 1974 through 1977. Although respondent disagrees with such an adjustment, we are compelled to allow petitioner to make the 8 percent volume adjustment. Respondent's own expert agreed that there was an 8 percent differential between water-scale and land-scale or truck-scale. Moreover, petitioner presented a wealth of information on the inadequacies of the water-scale process sufficient to persuade us that the water-scale method is obsolete. Willamette no longer uses water-scale as a system of measurement for any of its logs. During the years *517 1974 through 1977, USFS did no water-scale any of the comparable sales logs. All logs used in the comparable sales analysis were either land-scaled or truck-scaled. Therefore, without the adjustment to the subject timber we will be comparing the water-scaled subject timber to comparable timber that is land-scaled or truck-scaled. Because we accept as a fact the existence of the 8 percent differential in the volume measurements between these two groups of logs, an adjustment must be made to insure that we are obtaining the most accurate volumes to use in the Determination of the section 631(a) fair market values. Respondent cites sections 1.611-3(b)(1) and 1.631-1(a)(2), Income Tax Regs. to support the position that such an adjustment should not be allowed. However, these regulations are not relevant to the question of the volume adjustment, the former dealing with depletion allowances, the latter with the determination of when timber is to be considered cut. Neither regulation prohibits making an adjustment to the water-scale volumes in order that the most accurate volumes be reported. Respondent also contends that the water-scale adjustment constitutes a change in accounting *518 method. We do not agree. The applicable regulations provide that "a change in the method of accounting includes a change in the overall plan of accounting for gross income or deductions or a change in the treatment of any material item used in such overall plan." Section 1.446-1(e)(2)(ii)(a), Income Tax Regs. The term "material item" is defined by section 1.446-1(3)(2)(ii)(a) to mean "any item which involves the proper time for the inclusion of the item in income or the taking of a deduction." A change in method of accounting does not include, however, an "adjustment of any item of income or deduction which does not involve the proper time for the inclusion of the item in income or the taking of a deduction." Section 1.446-1(e)(2)(ii)(b), Income Tax Regs. See United States v. Ekberg,291 F.2d 913 (8th Cir. 1961), cert. denied 368 U.S. 920 (1961); Southern Pacific Transportation Co. v. Commissioner,75 T.C. 497, 682 (1980). We do not find that the water-scale adjustment, carried out to reflect an accurate log volume harvested during the year, is a change in Willamette's method of accounting *519 or a change in the treatment of a material item. The water-scale adjustment deal neither with the time for inclusion in income of any item nor with the taking of a deduction for any item. As such, it does not constitute a change in Willamette's overall method of accounting, nor is it a change in the treatment of a material item. Section 1.446-1(e)(2)(ii)(a), Income Tax Regs. Willamette's water-scale adjustment merely modifies the volume of a small portion of timber in order to correct a known inaccuracy resulting from the use of the water-scale method. This adjustment is akin to the many quality and species adjustments made by both parties and their various experts. Quite simply, respondent is "barking up the wrong tree" when he tries to characterize the adjustment as a change in accounting method.
4. Export Market Values
Respondent bears the burden of proof on the sub-issue of whether petitioner is entitled to use export prices in valuing its fee and private timber. [18]Achiro v. Commissioner,77 T.C. 881, 890(1981); Rule 142(a). Generally, there is a higher price to be obtained for export timber. Because of the promulgation *520 of the Anti-substitution Regulations, respondent argues that Willamette could not participate in the more lucrative private timber export market. Therefore, if we agree with respondent, when looking for comparable sales to value Willamette's private timber sales, the comparable sales affected by the higher values bid in the private timber export market must be excluded. We note that this controversy concerns only the subject private timber of Willamette and not that of Freres. Both parties agree that Freres could sell the private timber in the export market under the Regulations. The Regulations impose two restrictions, one on exports and the other on USFS purchases. The underlying rationale of the regulations is to prevent companies from selling their private timber into the more lucrative export market while purchasing public timber at low cost from the government. The result of the regulations is to insure a constant supply of timber for domestic consumption by not allowing the substitution of public timber for private timber in the export market. The term "substitution" *521 was defined for purposes of the export restriction by 36 C.F.R. sec. 221.25(e) (1974) for the taxable years in issue [19] as follows: Substitution is the purchase of timber from National Forest System lands to be used as replacement for timber exported from private lands. Such replacement occurs when with respect to historic levels, (1) the purchaser continues to export and increases his purchase of National Forest timber, or (2) the purchase of National Forest timber continues while the purchaser increases his export of unprocessed timber from private lands tributary to the plant for which National Forest timber covered by a specific contract is expected to be delivered. Historic level is defined as the purchase or export during 1974 or any subsequent calendar year of not to exceed year of not to exceed 110 percent of the average annual volume purchased or exported in calendar years 1971, 1972, and 1973. A company having *522 an historic level of 100 MBF of timber cut on federal lands and 100 MBF of private timber exported, would be permitted in years following 1973 to purchase or cut no more that 110 MBF of timber on federal lands while exporting no more than 110 MBF of private timber. However, under the Regulations, if no federal timber was purchased or cut during a particular year, the company would be free to sell all of its timber in the export market. Likewise, if no timber was exported, the company would be free to purchase or cut any volume of public timber. During the years 1971 through 1973 (the base period years) Willamette exported no private timber. Accordingly, Willamette's historical level, for purposes of the Regulations, in the years following 1973, was zero. That is, under the Anti-substitution Regulations, petitioner could not continue to purchase USFS timber and and export private timber in the same year because there was no historical base. The determination of whether Willamette could participate in the export market is necessary for developing the parameters of the hypothetical buyer and seller for the purposes of determining the fair market value of Willamette's subject *523 private timber. We agree with petitioner that the hypothetical buyer and hypothetical seller are not to be patterned after any one particular purchaser or seller. However, "the hypothetical sale should not be constructed in a vacuum isolated from the actual facts that affect the value" of the timber. Estate of Andrews v. Commissioner,79 T.C. 938, 956 (1982). Therefore, we must determine whether Willamette, or the "hypothetical seller" who is similarly situated, would be able to participate in the export market during the years 1974 through 1977. The parties agree that Willamette could not directly export its private timber and still purchase USFS timber, except in the case where Willamette sold the land and the timber together. Petitioner, however, points out several other variations in which Willamette could indirectly sell timber into the export market, thereby taking advantage of the higher-prices export market and still not be in violation of the Regulations. For example, Willamette could sell its private timber to an exporter who processes those logs domestically and turns around and sells its own private timber in the export market. In addition, even *524 if Willamette did sell directly into the export market and was debarred from any further purchases of USFS timber (debarment can range from three months up to one year), Willamette would not be precluded from purchasing a supply of USFS logs from private individuals. Moreover, at least during some of the years before the Court, a company in violation of the Regulations could purify itself (i.e. no longer be considered in violation) by stopping bidding on USFS sales during the year the violation took place. It is important to note, at this point, that the consensus of the expert testimony on this issue revealed that enforcement of any violation of the Regulations was questionable. In fact, no witness for petitioner or respondent could recollect the enforcement of the Regulations in a situation where there had been an indirect export violation. However, we do not assume that because the record is bare as to these matters that USFS never enforced the Regulations. Respondent has simply not shown otherwise. In addition, one of respondent's own valuation experts stated that, under the circumstances, had he not been directed by respondent to find values with and without the export *525 market influence, he would have normally written the report with the export market influence. When he did omit the export influence from his valuation report, he did so by excluding all private sales as comparables. This left the subject private sales to be valued by comparison to comparable USFS timber. By its nature and the differences in environmental restrictions, inflexible logging schedules and government "red tape", the USFS timber is simply not comparable to the subject private timber. Therefore, respondent's expert report concerning the values without the export influence is not helpful. In conclusion, we are convinced that Willamette (and the hypothetical seller) could have participated in the export market in the years in question through one means or another, and still could have been able to procure a sufficient supply of USFS timber to keep its mills and processing facilities running. In reaching our conclusion, we have considered the record pertaining to this issue, giving due weight to all relevant testimony and exhibits. Respondent simply did not overcome the burden of proof on this sub-issue. Achiro v. Commissioner, supra.
5. Road Credits
*526 The issue of whether petitioner may determine the fair market value of standing timber for section 631(a) purposes by using the high bid rather than the statistical high bid is pertinent only to the USFS timber harvested by petitioner in Oregon. Under the terms of a USFS contract, the successful bidder is required to build certain logging roads pursuant to specifications provided by USFS. Upon termination of the cutting contract the roads become the property of USFS. In return for building the roads, the purchaser is given a credit against the purchase price of the timber (purchaser road credit). The high bid ona USFS contract represents the cost of the timber with the roads in place. The statistical high bid, in turn, represents the bid price less the credit that the purchaser will receive when the roads are constructed. The purchaser road credit is an estimated amount determined by USFS to be the cost of building the roads on the particular timberland. These estimated costs are outlined in the prospectus given to potential bidders on a USFS contract. Therefore, the purchaser road credits are a known quantity at the time of the bidding. Since the road costs used to *527 formulate the purchaser road credits are only estimates, the actual costs of roads may be more or less. During the years 1974 through 1977, the estimates were usually deficient by 10 to 20 percent. As a result, purchasers conduct their own analysis of what the cost of building roads will be on a particular tract. When it comes time to bid, the purchaser adjusts the bid price downward to reflect the higher than estimated road costs inherent in the contract. Our task is to determine whether section 631(a) fair market values for timber incorporate the increase in the value of a tract of standing timber based on the existence of the logging roads. Petitioner argues that the bid price plus the purchaser road credit is the true reflection of fair market value (i.e., the high bid). Respondent, on the other hand, asserts that the calculation of fair market value must only be based upon the bid price (i.e., the statistical high bid.) [20]
*528 Neither party has supplied us with any real authority upon which to base a decision in this matter. However, if there is an answer to the interpretation of the statute, absent case law, the legislative history is the logical place to look. After searching through the various legislative materials we find only one paragraph that helps us in determining if the value of roads constructed on timberland is to be included in the determination of the fair market value of the timber itself under section 631(a). The report at H.R. No. 1337, to accompany H.R. 8300 (Pub. L. No. 591, the Internal Revenue Code of 1954), 83rd Cong., 2d Sess. 60 (1954) states that" In the year of cutting timber the expenses incurred in connection with the holding and quantity measurement of the timber are to be added to the adjusted basis and will reduce the amount of capital gain * * *." From this statement, we believe it is clear that Congress envisioned only certain costs would be reflected in the adjusted basis and, thereby, in the fair market value of the timber itself. These costs are costs incurred in holding timber and in measuring timber, neither of which includes the costs *529 of constructing roads. Our search did no yield any authority which would enable us to conclude that petitioner's position on this issue is the correct one. The authority that petitioner did cite is section 1.611-3(f)(1)(iii), Income Tax Regs., which requires that the fair market value be determined with reference to the condition of the property as it existed at that date * * *. Such factors as the following will be given due consideration: * * * (iii) Accessibility of the timber (location with reference to distance from a common carrier, the topography and other features of the ground upon which the timber stands and over which it must be transported in process of exploitation, the probable cost of exploitation and the climate and the state of industrial development of the locality) * * *. This language is not supportive of petitioner's position. The regulation merely points out that the physical characteristics of the land, impacting on its accessibility, should be a factor in the timber's fair market value. Much of the testimony in this case concerned the various factors influencing bid prices. Notably, the experts pointed out that timberland *530 which is comprised of mountainous terrain or steep hillsides requires extraordinary harvest methods. We do not think the regulations envision taking into account the existence or nonexistence of roads. At best, the regulations focus on the ability or inability to harvest the timber as a factor in determining fair market value. The section 631(a) valuation of "standing timber" is based upon the value of the timber itself and not the cost of constructing roads as well. Although the testimony of the experts in this case indicated that, if given two identical tracts, all would pay a higher price for the tract with an existing road, we believe that what they are paying for are two separate items; the timber and the existing road. Only the value of the "standing timber" is to be taken into account under section 631(a). Therefore, we conclude that the section 631(a) valuation of "standing timber" has a narrower meaning than petitioner argues. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Fair market value must be determined by using the statistical high bid.
6. Discount Issue
In the prior Willamette case (T.C. Memo. 1980-577) we stated that "economic *531 trends in the sale price of timber must be considered and adjustments made for such trends." Respondent believes that the comparable USFS, BLM and other long-term contract bid prices must be discounted to reflect a present value before they can be used as comparable sales prices in a section 631(a) valuation. Petitioner argues that the bid price on a multiple-year contract does not need adjustment because it represents the price a purchaser would pay in cash on the bid date. This argument springs from the special treatment given an owner of timberland who makes the section 631(a) election to treat the cutting of timber as a sale or exchange as of the first day of the taxable year in which it is cut. With such an election, section 1.631-1(d)(1), Income Tax Regs. provides that the cost or basis of this timber shall be determined as if the taxpayer had purchased the timber on the first day of the taxable year for a price equal to the fair market value. See Ellingson Timber Co. v. Commissioner,T.C. Memo. 1977-197. This new basis shall be the basis used to determine the gain or loss resulting from the sale or exchange of the logs when they *532 are processed and sold from inventory as timber products. Thus, section 631(a) provides for a hypothetical sale on the first day of the taxable year of all eligible timber cut during the year by petitioner. To determine the hypothetical sale price we look to sales of comparable timber which took place on or around the section 631(a) valuation dates (i.e., January 1, 1974, June 29, 1974, January 1, 1975, January 1976 and January 1, 1977). From those sales we can then derive the fair market value of petitioner's eligible timber. However, a majority of the comparable sales (all government sales) are multiple-year contracts to cut timber. They do not require the purchaser to pay cash on the bid date, but require payment sometime in the future when the timber is cut. In Louisiana, the contracts are generally three years in length, while in Oregon the contract period can run up to five years. Respondent argues that the timber market was on the rise during 1970's. The rising timber prices coupled with increasing inflation caused the bidders on timber contracts to bid more on a long-term contract because they knew they would not have to pay until they actually harvested the timber. *533 Since the government timber contracts only require that one harvest the timber some time prior to the expiration of the contract term, conceivably the purchaser would not have to cut until the later years of the contract. Thus, the bidder would not only have the use of the money for a period of years, but by the time of the harvest, the stumpage prices would have increased as well. Petitioner argues that no adjustment is necessary to discount the bid price on a long-term contract to reflect a present value upon which to base the fair market value of the subject timber. It is no small wonder that all of petitioner's experts back up this position with their testimony and their expert reports. The claim is made that such a discount adjustment would be necessary only if the bid price had any correlation to the length of the contract. Accordingly, petitioner's experts cite studies where no correlation has been found. Notwithstanding these statistical analyses (neither the studies nor the authors were before this Court), the overwhelming evidence in the record points to the opposite conclusion. There are a myriad of factors which go into the calculation of a bid price, including *534 the quality and the quantity of the timber involved and the company's particular need for the supply of timber to feed its mills. In addition to these timber oriented factors, the formulation of a bid price also includes the weighing of the time value of money. As inflation and prices rise, so does the emphasis on this aspect of financial planning. As a result, and because the years 1974 through 1977 presented the timber industry with a rising economy, we can only conclude, based on the entire record in these cases, that purchasers did take into account the fact that payment on long-term timber contracts would not be made until sometime in the future. Thus, these bid prices actually represent the price the willing buyer would pay for timber in the future, not a price to be paid currently. Therefore, bids on a long-term cutting contracts must be discounted to reflect a current cash value (or present value). Respondent introduced two different discount theories during the presentation of these cases, the Dowdle theory, developed by Professor Barney Dowdle, and the Hammon, Jensen and Wallen theory (HJW theory). The former was discussed in detail in Peek v. Commissioner,T.C. Memo. 1983-224, *535 and subsequently rejected. Notwithstanding some changes made to the Dowdle theory after that case, we are still unable to embrace this complex and retrospective economic model as a practical solution to the 631(a) valuation problems facing the timber industry. It is quite clear that the Dowdle theory can provide us with a detailed and accurate look at what was happening to the timber industry back in the years 1974 through 1977. However, Dowdle himself admits that his model is a product of hindsight. Therefore, we must again reject this theory as an unworkable and impractical model for discounting the bid prices on government timber contracts. [21]
*536 Having decided that some discount is necessary in valuing the comparable government timber sales, we examined the HJW theory presented by respondent's experts. Respondent abandoned this theory at some point during the trial in order to fully support the Dowdle theory. Perhaps this was because, as respondent's own experts pointed out, the two theories are mutually exclusive. However, unlike the Dowdle theory, we find the HJW theory a workable solution to the problem of arriving at the most accurate comparable values for use in the section 631(a) valuation. Generally, a discount rate would reflect the risk inherent in a particular financial undertaking. However, the HJW theory gives no added discount on account of risk for two reasons. One is that timber represented a sound investment in the 1970's, with increasing demand (housing), decreasing supply (environmental concerns), and low risk of physical loss due to disease or fire. The second factor is that the terms of the cutting contract itself can increase the risk on a particular purchase. Since the BLM subject timber is compared only to BLM comparable sales, and so on, the risk elements inherent in the contracts have been *537 equalized and need not be represented as part of the discounting percentage. Since a purchaser of government timber has the ability to cut timber at any time, the discount formula must reflect the fact that cutting of timber takes place throughout the contract period. Although HJW assumed a cut-out schedule of 10 percent in the first year with the remainder to be cut out evenly over the term, the record in these cases leads us to a different conclusion. Therefore, the HJW theory shall be adjusted to reflect a 12 percent cut-out in year one, with the remaining 88 percent being cut out evenly over the following years of the contract. (Obviously this rule does not apply where the contract specifies a cut-out schedule). Therefore, with the exception of the minor changes indicated below, we endorse the HJW theory as the correct mathematical explanation of how and to what extent bid prices, during 1974, 1975, 1976 and 1977, must be discounted to accurately reflect the present value of comparable sales prices for section 631(a) valuation purposes. The HJW theory begins with the standard formula for determining the present cash value of a single future payment by discounting that *538 future payments over time by the relevant cost of money (or interest rate). This standard discounting formula is then modified to apply to the facts of this case. The HJW theory first modifies the standard formula to discount a series of payments made over a period of time, rather than just a single payment. Further modification is required to account for the fact that no interest is incurred on payments made within the first 12 months of the contract. Thus, the accepted interest rate of 8 percent for the years 1974, 1975, 1976 and 1977 will not be paid on the timber harvested in the first year of each contract. We have found 8 percent to be the applicable interest rate for the years involved, based on the rate charged on various debt instruments during those years. Although the interest rate remains static over the life of the contract under the formula as applied in these cases, the interest rate for any other year must be independently determined by reference to the various economic factors in existence during the particular period for which the interest rate is sought. Next, allowance must be made to accommodate variations in the volumes of timber harvested each month *539 over the term of the contract. Based on the record as a whole, we find that first year logging operations took place mainly to clear space for the construction of roads and that harvesting in the first year varied from anywhere between 10 to 15 percent. This variation in the first year logging schedules leads us to find that a cutting schedule of 12 percent in the first year, with the remaining 88 percent to be cut out evenly over the remainder of the contract term, appropriately reflects the volumes harvested under the multiple-year contracts in question. Therefore, the 12 percent paid in the first 12 months of the contract is not subject to discounting since it represents an actual cash payment for timber made in the first year. Thus, the HJW theory, adjusted accordingly is sensitive to both the prevailing interest rate and the cutting schedules on long term timber contracts.
Conclusion
In the discussion of these cases, we have set out several guidelines for the parties to follow regarding the most accurate calculation of section 631(a) values for the years 1974 through 1977. We have resolved various issues relating to adjustments for growth, water scale and road credits. *540 In addition, we have articulated an approach to be applied to the contracts having a term of greater than one year by which prices are discounted to accurately reflect the present value of comparable sales. (Unless of course, such contracts have their own stated interest rate or cutting schedules. If such is the case, then the HJW theory can be adjusted and applied to reflect the specifications outlined in the contract). As a result of resolving these cases in a manner other than picking the fair market values of timber as we have done in the past, a calculation by the parties under Rule 155 will be necessary. However, we feel further guidance is needed for the parties in arriving at the fair market values of eligible timber. Since we were unable to simply pick one expert appraisal as supplying the definitive answer in these cases, we are still in need of identifying a comparable sales data base for purposes of the Rule 155 calculation. After reviewing each expert report we find that the best data base of comparable sales is found in the Cascade Appraisal Services report prepared by Ray E. Granvall, Jr. (Oregon values) and the Pomeroy & McGowin appraisal report prepared by *541 Donald W. Samson (Louisiana values). [22] Thus, these comparable sales shall be the foundation of the Rule 155 calculation, along with the volumes cited therein. The comparable sales shall be adjusted, when necessary in accordance with this opinion. *542 We hope that the parties will now be able to resolve the issue of fair market value for 631(a) purposes pursuant to the instructions given herein. Once again, we feel that the parties could have arrived at this point on their own. Surely the saying most applicable to this case is that because of the volume of testimony and the apparent hostility of the parties and their attempts to obscure the facts and issues herein, the Court found it most difficult "to see the forest for the trees." However, we have emerged from the forest and hopefully have given the parties sufficient direction to determine their section 631(a) values, albeit by way of a Rule 155 computation. Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted. All Rule references are to the Tax Court Rules of Practice and Procedure unless otherwise noted. ↩
2. As part of the overall settlement of all other issues, the parties have stipulated that cost depletion shown on petitioner's income tax returns for 1974 through 1977 will not be adjusted. ↩
3. The election permits the cutting of timber, under certain circumstances, to be treated as the sale or exchange of the timber cut during such year. ↩
4. It should be noted that a very small portion of the timber comprising the values and volumes of what we are calling Louisiana timber came from logging operations in Arkansas. ↩
5. The term MBF is unit of timber measurement which is used to describe timber volume in "thousand board feet." A board foot is a one-foot square piece of wood, one inch thick. ↩
6. Pulpwood is measured in cord units rather than board feet. A cord is a pile of wood 8 feet long, 4 feet high and 5 feet wide. ↩
7. A timber cruise is a method of sampling standing timber (stumpage) for the purpose of estimating species composition, volume and grade in a particular area. Prior to a USFS sale in Louisiana, the Forest Service conducts a cruise of the timber for the purpose of estimating the value, volume and quality. Based upon such estimates, the Forest Service then determines which tracts are to be offered for sale. Once a sale are is defined, the USFS prepares an appraisal of the value of timber in that area by species (pine, hardwood) and grade (quality). The USFS timber cruise takes place approximately six to nine months before the actual action or bid date. ↩
8. The growing period is March 15 to November 15. On the LouisianaUSFS contracts, growth inures to the benefit of the purchaser, from the cruise date to the bid date, and then, from the bid date to the cutting date. ↩
9. These figures relate to Wilmar Plywood, Inc., one of petitioner's subsidiaries. ↩
10. Per Acre Material is abbreviated in the timber industry as PAM. Essentially, this is non-merchantable timber sold on a lump-sum basis. However, some PAM is made up of small merchantable sawmill grades of logs that have less than eighty board feet per log. To harvest this timber, the USFS charges the purchaser on the basis of x dollars per acre multiplied by the number of acres. A total PAM price is set forth in a USFS contract. ↩
11. The parties have agreed to a volume adjustment referred to as the "Hill usage" adjustment, therefore we need not discuss the surrounding circumstances or facts in any great detail. ↩
12. The Anti-substitution Regulations (Regulations) went into effect immediately and were retroactive to January 1, 1973. 39 Fed. Reg. 9663↩ (1974). 13. For a company that exported an average of 100 MBF during the years 1971, 1972 and 1973 and, was also purchasing 100 MBF of USFS timber during those years, the Regulations permitted the company to export 110 MBF of private timber while at the same time purchase or cut no more than 110 MBF of USFS timber. If no USFS timber was purchased or cut in a particular year, the company was free to export as much private timber as it wanted. Similarly, if no timber was exported, the company could purchase or cut any amount of USFS timber in that year. ↩
14. Sec. 631(a), as in effect during the years in issue, provided in part: (a) Election to Consider Cutting as Sale or Exchange. - If the taxpayer so elects on his return for a taxable year, the cutting of timber (for sale or for use in the taxpayer's trade or business) during such year by the taxpayer who owns, or has a contract right to cut, such timber (providing he has owned such timber or has held such contract rights for a period of more than 6 months before the beginning of such year [more than 9 months, for 1977]) shall be considered as a sale or exchange of such timber cut during such year. If such election has been made, gain or loss to the taxpayer shall be recognized in an amount equal to the difference between the fair market value of such timber, and the adjusted basis for depletion of such timber in the hands of the taxpayer. Such fair market value shall be the fair market value as of the first day of the taxable year in which such timber is cut, and shall thereafter be considered as the cost of such cut timber to the taxpayer for all purposes for which such cost is a necessary factor. * * * ↩
15. This valuation date applies only to Wilmar Plywood, Inc., one of petitioner's subsidiaries. ↩
16. In denying the motion, we concluded that the matters addressed in the prior action were merely commented on for illustrative purposes, and were not to be taken as having established guidelines applicable in the present cases. New factual issues exist due to the involvement of different trees and different years. Accordingly, the current facts are separable from those in the prior action. ↩
17. We also note, but do not rely on the fact, that this same conclusion was reached in our prior case, Willamette Industries, Inc. v. Commissioner,T.C. Memo. 1980-577↩. Perhaps this will be one issue this Court will not have to hear again in the parade of timber valuation cases between petitioner and respondent. We think it is quite clear that the Continental Can Company (CCC) timber was at least as valuable as the USFS timber in Louisiana during the years at issue.
18. This issue was first raised by respondent in amended answers filed with the Court on October 16, 1984. ↩
19. For the years 1974 through 1976, this definition is found at 36 C.F.R. sec. 221.25(e) (1974). For the year 1977, this definition is located at 36 C.F.R. sec. 223.10(e) (1977)↩. 20. Part of respondent's argument surrounds the application of Revenue Ruling 71-354, 1971-2 C.B. 246, to petitioner's calculation of basis for purposes of depletion. As both parties have stated at one time or another in this case, the calculation of basis for purposes of depletion under Rev. Rul. 71-354 is irrelevant to the determination of fair market value under section 631(a). Moreover, petitioner and respondent have made an agreement that the depletion basis calculated by Willamette is correct. The circumstances surrounding the agreement are not in the record, nor was this Court a party to that agreement. However, the result of the agreement is reflected in the Partial Settlement Stipulation. Therefore, we do not pass judgement on the validity of Rev. Rul. 71-354↩ and its application to the petitioner in the years before the Court. We only note that the parties themselves have determined and agreed upon the depletion basis utilized by petitioner in the years before the Court. 21. It is worth noting that even if we did find the Dowdle theory to be a practical solution to the discounting issue at hand, we do not accept the underlying discount rate suggested therein as accurate for use in the current situation. In the present cases, Dowdle proposes the use of the anticipated rise in market prices as the rate at which future timber prices should be discounted back to present value. In the prior presentation of this theory in the Peek case he suggested an entirely different rate upon which to base the discount. Peek v. Commissioner,T.C. Memo. 1983-224↩. 22. The Pomeroy & McGowin appraisal report (exhibit 65) deals only with the comparable sales of pine sawtimber and hardwood sawtimber. Petitioner and respondent, although unable to agree on anything else in these cases did agree as to the values for pine pulpwood and hardwood pulpwood. These agreed upon values shall remain unchanged by the Rule 155 computation and we accept them as correct fair market values for section 631(a) purposes. These values are listed in the Louisiana section of our Findings of Facts. The Cascade Appraisal Services report (exhibits 56, 57, 58, 59, 60 and 61) contains a large volume of comparable sales for USFS, BLM, private and other timber sales. The parties should begin with the values reflected therein, make the adjustments called for in this opinion and be able to arrive at the Court-mandated fair market values for section 631(a) purposes. In determining that the Pomeroy & McGowin and the Cascade Appraisal Services reports are to be the foundation of the fair market value calculations in these cases, we accept all adjustments therein for quality, species and logging costs except↩ those particular adjustments discussed in this opinion referring to: (1) CCC timber values; (2) adjustment for growth on Louisiana timber; (3) water-scale adjustment to Oregon timber; (4) export value adjustment to Oregon timber; (5) use of the statistical high bid for Oregon timber fair market values; and (6) discount adjustment to contracts exceeding one year for both Louisiana and Oregon timber.