KLUKWAN, INC. AND SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Klukwan, Inc. v. Commissioner
Docket No. 14342-92
United States Tax Court
T.C. Memo 1994-402; 1994 Tax Ct. Memo LEXIS 413; 68 T.C.M. (CCH) 446; 94-2 U.S. Tax Cas. (CCH) P47,964; August 18, 1994, Filed *413 Decision will be entered under Rule 155. For petitioner: *John T. Piper, Don Paul Badgley, and Kay Sirlin Slonim. For respondent: Wendy S. Pearson, Henry Thomas Schaefer, Christopher D. Hatfield, Terri A. Merriam, Randall E. Heath, and Robert F. Geraghty. KORNER
KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined a deficiency in petitioner's Federal income tax in the amount of $ 6,921,356 for 1988. All statutory references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted. Questions Presented
After the settlement of various controversies between the parties, the following issues remain for us to decide: 1. What was petitioner's allowable net operating loss in years 1977 through 1988? a. Resolution of this question, in large part, will involve a determination of the fair market value of petitioner's standing timber on June 5, 1980, and the allowable depletion deductions *414 [1] resulting therefrom. b. To the extent not already settled by the parties, any remaining issues relating to the determination of the net operating loss must be decided.
2. Was petitioner liable for the alternative minimum tax for 1988? 3. Could petitioner's net operating losses for years subsequent to 1988 be carried back as allowed by statute? 4. Where net operating losses were purchased by others, and if overpayments therefor were made, to what extent should such payments "spring back" to the payors and become their income or reduce their deductions? FINDINGS OF FACT The village of Klukwan is the home of the Chilkat Indians. The Chilkats are of the Tlingit peoples, one of the principal aboriginal races of Alaska. Klukwan is located approximately 110 miles north of Juneau, Alaska, near the town of Haines, Alaska. Pursuant to the Alaska Native Claims Settlement Act (ANCSA), Pub. L. 92-203, 85 Stat. 688 (1971) (current version at *415 43 U.S.C. secs. 1601-11629e (1988)), the present petitioner, Klukwan, Inc. (Klukwan), was formed. ANCSA had authorized the formation of geographic regional corporations and a number of village corporations within the 13 regions in the State of Alaska. One of the eligible villages was the village of Klukwan. Petitioner was formed and recognized in 1976 as an Alaska native village corporation (ANC) eligible to serve as a vehicle for accepting land and settlement funds from the Government for qualified Chilkat Indians from Klukwan Village pursuant to the provisions of ANCSA. Klukwan is one of 12 village corporations located within the geographic region encompassed by Sealaska Corp. (Sealaska), the regional corporation. Petitioner's principal place of business now and at the time it filed its petition herein is Juneau, Alaska. Pursuant to ANCSA, each ANC, including Klukwan, was entitled to choose 23,040 acres of land in exchange for the relinquishment of all aboriginal land claims of its shareholders. Klukwan accordingly became entitled to make a selection of land. In 1976, Congress allowed Klukwan to make a land selection outside the historical *416 environs of its shareholders, the Chilkat Indians. In early 1977, the Klukwan board of directors determined to make land on Long Island, Alaska, its selection of first priority. On June 5, 1980, Klukwan received conveyance of approximately 21,520 acres on Long Island pursuant to ANCSA. This acreage was located within the boundaries of the Tongass National Forest. Under the terms of ANCSA, Klukwan's basis in the Long Island land and timber that it received was the fair market value thereof on the date of conveyance or the date of first commercial development. 43 U.S.C. sec. 1620(c). Klukwan chose as its valuation date the date of conveyance June 5, 1980, for both Federal income tax and financial accounting purposes. Long Island, Alaska, the location of the congressional grant to Klukwan under ANCSA, is located west of Cordova Bay off the southwest coast of Prince of Wales Island in southeast Alaska. It is at the southern end of U.S. territory in Alaska, which includes the long archipelago of islands and portions of the Pacific Coast mainland stretching south from Skagway and Juneau to the international boundary with Canada at the Dixon Entrance *417 from the Pacific, which leads to the Port of Prince Rupert, Canada. Long Island is sheltered from the Pacific Ocean to the west by Dall Island; it has natural coves, but it had no port facilities in 1980. Long Island is some 250 air miles from Juneau, Alaska, and some 50 air miles from Ketchikan, Alaska, which is the nearest town of any size providing air and ferry service to the mainland. Over 70 percent of the island was included in the conveyance that Klukwan received on June 5, 1980. The portion of Long Island that Klukwan acquired was heavily forested. It was natural growth and had never been cut over, except for about 12 percent that was second growth timber. The parties are in agreement that, in general, the Long Island timber was of higher quality than typical southeast Alaska timber, and markedly better than comparable timber from northwest Washington, the nearest U.S. territory outside Alaska. Regarding the volume, species, and grade distribution of the net merchantable and net utility timber on Long Island, the parties have agreed as follows: Thousand Board
Distribution
Distribution
Species
Grades
Feet (MBF)
By Grade (%)
By Species(%)
Sitka
Select/peeler
19,667
11
spruce
Special mill
12,116
7
#1 Sawlog
26,672
16
#2 Sawlog
65,561
38
#3-4 Sawlog
29,567
17
Utility
19,158
11
100
Total spruce
172,741
32
Western
Select/peeler
8,723
3
hemlock
Special mill
31,646
9
#1 Sawlog
22,975
7
#2 Sawlog
159,994
48
#3-4 Sawlog
56,988
17
Utility
53,790
16
100
Total hemlock
334,116
62
Red
Select/peeler
cedar
Special mill
#1 Sawlog
32
--
#2 Sawlog
1,018
7
#3-4 Sawlog
28,901
93
Utility
70
--
100
Total red cedar
31,021
6
Alaska
Select/peeler
10
--
yellow
Special mill
180
13
cedar
#1 Sawlog
30
2
#2 Sawlog
999
71
#3-4 Sawlog
198
14
Utility
--
--
100
Total Alaska yellow
1,417
negligible
cedar
Total timber volume
539,295 MBF
100
*418 Petitioner's timber consists primarily of old growth Sitka spruce and western hemlock. Sitka spruce, the largest of the world's spruce, is seldom found far from tidewater, where moist maritime air and summer fog maintain the humid conditions necessary for growth. Its range is limited to a narrow mainland strip along the Pacific Coast which extends roughly from upper Oregon continuing northward to Anchorage, Alaska. In 1977, the U.S. Forest Service (USFS) estimated that approximately 89 percent of America's inventory of Sitka spruce was located in Alaska and the majority of this volume was found in the southeast portion of the State, where petitioner's Long Island timber is located. Only a small volume of Sitka spruce is exported from the Pacific Northwest. Relative to Pacific Northwest timber, Sitka spruce is a vigorous, fast-growing, impressive, tall straight tree that is associated with western hemlock in dense stands where growth rates are among the highest in North America. Mature trees in the Tongass National Forest average 160 feet in height and 3 to 5 feet in diameter at chest height. Major uses are as high quality lumber and pulp, and there are also many specialty *419 uses for Sitka spruce. Western hemlock is the largest of the four American hemlocks. Again, the largest stands are found in the humid coastal regions of Alaska, British Columbia, Washington, and Oregon. The USFS also estimated in 1977 that approximately 45 percent of the total 257 billion board feet of western hemlock in the United States is located in Alaska, 35 percent in Washington, and 17 percent in Oregon. Under the best growing conditions, these trees can exceed 3 feet in diameter and 225 feet in height. Western hemlock is preferred over its major competitor, Douglas fir, for industrial lumber and finish lumber where even-wearing and good machining characteristics are important. Long Island trees exceeding 6 feet in diameter were not uncommon for either species. Western hemlock is the major species exported from Washington and Oregon. In 1980, these exports accounted for more than 50 percent of all log exports. Most exported logs were cut from private lands and lands managed by the State of Washington Department of Natural Resources (DNR). Exporting raw logs cut on Federal and State lands in Oregon was prohibited in 1980. Long Island hemlock is similar to the hemlock *420 grown in the Pacific Northwest, but there was nothing in the world comparable to Long Island's Sitka spruce. Except for Douglas fir, the subject timber included the same species marketed to the Pacific Rim for 20 years from Washington, Oregon, and northern California. The unusually large size of the timber on the Long Island tract could be expected to produce the highest valued logs. Southeast Alaska timber had developed a reputation for quality due to its export of cants (logs with one or more squared sides) from Federal lands to the Pacific Rim market. Supplies of large, high quality old growth timber were substantially diminished by the time of petitioner's Long Island conveyance. During the period from 1968 to 1980, western Washington's annual harvest levels for old growth (160 years and older) Sitka spruce and western hemlock had declined respectively from 92 million board feet (MMBF) to 30 MMBF, and from 1,300 MMBF to 550 MMBF. Public pressures to reduce log exports added to the growing possibility of limitations on the export of timber. After 10 years of high demand, the USFS projected substantial harvest declines in the Pacific Northwest and corresponding timber price *421 increases beginning as early as 1975. Additionally, increasing restrictions on the harvesting of public timber signaled a future supply crunch. Petitioner acquired 539,295 MBF of highly desirable, mostly export quality scarce old growth spruce and hemlock, and some cedar. Approximately 88 percent of the subject timber was old growth; the remaining 12 percent was second growth. The size and diameter, as well as the slower growth characteristics of old growth timber, produce logs that contain a large amount of fine-grained, bright, clear, and knot-free wood that was in high demand. Wood from young, managed stands generally lacks these knot-free, slow growth characteristics. The rarity, quality, and size of the Long Island timber would have commanded a high degree of market interest in 1980. The highest and best use for this timber would be as commercial timber, and the final product would be logs destined for the Pacific Rim export market; the principal customer in this market during 1980 was Japan. The most likely bidders for the timber on Long Island would be major integrated timber industry companies. Given the volume, quality, and fee nature of petitioner's timber, these *422 bidders would all consider Long Island to be a long-term strategic investment, giving very little, if any, consideration to cyclical short-term market fluctuations. Buyers recognized that short-term peaks and troughs of the market would continue, but rare purchase opportunities were to be seized. The Long Island conveyance to petitioner encompassed one contiguous block of timber with no physical or topographical impediments to harvesting. There were no major rivers or mountains. Terrain was gentle to moderate with elevation range from sea level to 1,185 feet; most of the timber was below 500 feet. Temperatures range roughly from 34 to 43 degrees during fall and winter and from 44 to 62 degrees during spring and summer. Precipitation is mostly in the form of rain and averages 120 inches annually. Shipment distances to the Pacific Rim are somewhat closer than for other major suppliers of export logs: Washington and California. Selling export logs requires the acquisition of the raw material, timber. Timber can be acquired in a number of ways: one is by owning land and waiting for the timber growth to reach a merchantable state when it can be profitably harvested. Stumpage *423 (i.e., standing timber) can also be purchased through a stumpage contract or in fee without acquiring the ownership of the land upon which it is growing. Fee ownership carries the full benefits of timber ownership. A stumpage contract is a limited-term contract providing for the right to harvest (cut) standing timber. A stumpage contract limits the timing of harvesting to a stated period, the method(s) to be used and area to be harvested. A public stumpage contract, e.g., one sold by the USFS, Bureau of Land Management (BLM), or a State Government may also limit the sale of logs to domestic buyers only. Such limitations do not allow the flexibility of fee ownership which gives the purchaser total freedom regarding the timing of harvesting and methods used, provided only that the activities comply with applicable laws. Fee ownership allows the owner to determine the best time to cut timber, given considerations such as the present market and his supply requirements. In 1979, an outside firm was retained by Sealaska, on behalf of petitioner, to perform an inventory and valuation of the timber resources that petitioner had received. The firm retained understood that its valuation *424 would be used both for financial and tax purposes. The report that was rendered to petitioner in August 1981 purported to value petitioner's acquired timber on Long Island as of June 1980. The report stated a fair market value for the timber of $ 134,551,800. In making this valuation for petitioner, the firm used certain assumed quantities and grades of timber. [2]
Petitioner filed consolidated corporate Federal income tax returns (with subsidiaries) ending at the end of February for years 1977 through 1984, and for years ending December 31 for 1984 through 1991. Such filings for certain years also included amended returns as well as claims for refund. In all such returns, beginning with the year 1982, petitioner reported depletion deductions for its Long Island timber sold during the respective tax years, [3] as well as inventory writedowns [4] in accordance with the *425 "lower of cost or market" approach for computing ending inventory. For the years 1982 through 1991, petitioner's claimed depletion deductions (including amended returns) were as follows: Year Ending
Depletion Claimed
Feb. 1982
$  3,354,694
Feb. 1983
10,466,177
Feb. 1984
11,309,472
Dec. 1984
9,380,177
Dec. 1985
13,659,905
Dec. 1986
56,406,225
Dec. 1987
37,173,004
Dec. 1988
38,663,082
Dec. 1989
27,339,405
Dec. 1990
26,353,427
Dec. 1991
6,004,585
For each of the years 1977 through 1988, except for 1987, petitioner reported no taxable income but a net operating loss before the carryforward of prior years' losses. For 1987, petitioner reported net taxable income before the application of a claimed net operating loss carryforward, which eliminated the reported net income. *426 Upon audit of petitioner's 1988 return, respondent issued a statutory notice of deficiency, dated June 16, 1992. Respondent determined that the largest element contributing to petitioner's consistent net operating losses was the deduction for timber depletion. Respondent further determined that the fair market value of the Long Island timber received by petitioner in 1980 was $ 105 million. Respondent accordingly recalculated petitioner's net income or loss, including net operating loss carryforwards, beginning with the year 1977. [5] The first year in which petitioner had claimed depletion deductions was 1982. Respondent reduced petitioner's allowable deductions for depletion for the years and in the amounts as follows: [6]
Year Ending
Depletion Disallowed
Feb. 1982
$  8,375,351
Feb. 1983
16,193,777
Feb. 1984
15,859,539
Dec. 1984
12,829,696
Dec. 1985
19,726,628
Dec. 1986
48,107,962
Dec. 1987
26,901,135
Dec. 1988
28,155,952
As the result of these and other adjustments, respondent determined that petitioner had allowable net operating loss carryovers from the years and in the amounts as follows: Year Ending
Allowable Carryover
Feb. 1977
$    50,625
Feb. 1978
58,873
Feb. 1979
12,723
Feb. 1980
77,080
Feb. 1981
925,257
Feb. 1982
1,574,039
Feb. 1983
492,465
Feb. 1984
2,811,858
Dec. 1984
1,796,516
Cumulative total net
7,799,436
operating loss carryovers
*427 For the year 1985, respondent applied $ 6,172,453 of the above accumulated losses against petitioner's redetermined taxable income. For the year 1986, respondent determined that the remaining amount of net operating loss carryforwards, of $ 1,626,983, was fully absorbed by petitioner's income for that year, leaving a balance of net taxable income. For the year 1987, respondent determined that petitioner had no net taxable income (because of other deductions allowed) even though the prior net operating loss carryforwards had been fully absorbed, but that petitioner did owe amounts for other taxes, which were not determined as a deficiency. For the year 1988, after various adjustments to deductions and credits, respondent determined that petitioner had a deficiency of tax in the amount of $ 6,921,356. In making this determination, respondent did not allow deductions from income with regard to any net operating loss carrybacks from years after 1988. *428 Pursuant to enabling legislation, petitioner entered into tax-sharing agreements with Drexel Burnham Lambert (Drexel Burnham) and the Walt Disney Co. (Disney) to "sell" some of Klukwan's net operating losses in 1986 and 1987. To accomplish this result, Drexel L.P. and Snowball were created by Drexel Burnham and Disney, respectively, as qualifying affiliates of Klukwan (within the meaning of section 1504(a)) for the purpose of receiving income and utilizing the net operating losses of Klukwan in a consolidated return. Pursuant to the agreement between Disney and Klukwan, Klukwan acquired all 100 shares of Snowball's class A voting common stock, and Disney acquired all 9,900 shares of Snowball's class B nonvoting common stock, as well as all 90,000 shares of Snowball's preferred stock. For Disney's determined share of tax liability, Disney was to pay the following amounts to Klukwan: 34 cents for each dollar of net operating losses utilized up to $ 50 million, 35 cents for net operating losses utilized between $ 50 and $ 80 million, and 36 cents for each dollar of net operating losses utilized in excess of $ 80 million. To effect the utilization of net operating losses for the *429 year 1987, Drexel L.P. and Snowball reported affiliated income of $ 11,882,017 and $ 109,999,721, respectively, of Klukwan's consolidated return. Accordingly, Klukwan received a total of $ 38,300,000 from Disney in 1987. Pursuant to a similar agreement with Drexel Burnham, Klukwan received a total of $ 3,802,500 for the years 1986 and 1987. Due to respondent's determination of petitioner's tax loss for 1987, respondent allowed only $ 11,632,017 of the above income assignment to Drexel L.P., and none of the assignment to Snowball. Accordingly, respondent removed $ 110,249,721 of the above income assignments from petitioner's return by granting a corresponding deduction from petitioner's income ($ 250,000 in the case of Drexel L.P. and $ 109,999,721 in the case of Snowball) with the statement that such amounts were "properly taxable to the companies that purchased the net operating losses and/or credits." A closing agreement between the parties augmented by a written stipulation between them in this case governs the treatment of Klukwan receipts from Drexel Burnham for 1986 and 1987. OPINION I. Net Operating Loss
A. The Value of Klukwan's Timber
The standard to be *430 used in determining the fair market value of petitioner's ANCSA Long Island, Alaska, timber conveyance on June 5, 1980, is that hypothetical price at which the subject timber would be sold in a transaction between a willing buyer and willing seller, both having the most reliable and accurate information available on the valuation date and neither being under any compulsion to buy or sell. Buse v. Commissioner, 71 T.C. 1129, 1135 (1979); sec. 1.631-1(d)(2), Income Tax Regs. All factors that would affect the selling price of the subject timber must be considered. Included among these factors are the character, quality, quantity, and location of the timber, as well as its accessibility. Disinterested appraisals of value are also valid considerations. Sec. 1.61-3(f), Income Tax Regs. Where possible, the comparable sales method of valuation is preferred over the conversion return method. Buse v Commissioner, supra.Therefore, the best indications of value are contemporaneous sales of comparable timber. To be comparable, a timber sale must be of like species, quality, quantity, etc., to the subject timber. Willamette Indus., Inc. v. Commisioner, T.C. Memo. 1987-479. *431 The geographic market area from which comparable sales may be chosen must be identified. Ideally, comparable sales will be from tracts in close geographic proximity to the timber being valued. The quantity of timber sold must also be reasonably comparable with that of the subject timber. Willamete Indus., Inc. v. Commissioner, T.C. Memo. 980-577. We must value the fee ownership timber interest acquired by petitioner on June 5, 1980. We understand the difficulties each of the parties had, as there were no fee sales of timber in southeast Alaska near this time period and there was but one allegedly comparable private stumpage sale, the Skowl Arm sale. There were several log sales not directly comparable during this period. To aid us, the parties have put forth the opinions of their own experts. Respondents principal expert, Robert P. Latham (Latham), holds a Ph.D. in resource economics, and since 1982 his consulting practice has primarily involved the economic and investment study of timber. In the early 1960s, he worked with the USFS in Arizona and was involved with timber sales and grazing permits. From 1967 to 1972, as a research fellow at *432 the University of Minnesota, his projects focused on the use of aerial photos in natural resource analysis, and later in 1977 he taught "aerial photo techniques and the economics and management of timber as an associate professor at Oklahoma State University. He has authored numerous publications in scientific and technical journals. He also operated an aviation company which for a limited time provided aerial photography for his consulting practice. Latham is also a certified general appraiser and a registered professional forester and has completed a number of appraisals in the South, West, Minnesota, Oregon, and Washington. Petitioner's principal expert, Wesley Rickard (Rickard), is a registered forester and holds bachelor's and master's degrees, respectively, in forestry and forest economics. Rickard was employed at the Weyerhaeuser Co., an international timberland and forest products firm in Tacoma, Washington, as a forester from 1959 to 1960, and as manager of the Forest Economics Department from 1962 to 1968. During the interim, he was engaged in forest economics research with the USFS in Portland, Oregon. Since 1968, Rickard has consulted with forest owners in the valuation *433 of forests and the development of forest management strategies and plans in many southern, western, and northern States. 1. The Appraisal for Respondent (Latham)
The two principal experts (Latham and Rickard) chose different methods for valuing petitioner's timber. Latham chose to compare the Skowl Arm stumpage sale to that of the subject timber and to adjust the purchase price appropriately for any perceived differences. He valued the subject property at $ 135 million. As a check on this value, Latham developed a single discounted cash-flow (DCF) model, valuing Long Island timber by using demonstrated log prices and incorporating several assumptions regarding costs, harvest liquidation periods, interest, tax, discount, and inflation rates. Latham's comparable case was this, in his opinion. The board of directors of Kavilco, Inc. (Kavilco), another ANC, voted in favor of selling a portion of its ANCSA conveyance in order to raise capital for its needy shareholders. On August 21, 1979, Foresters and Managers, Inc., acting on behalf of Kavilco, notified approximately 30 parties by letter of a lump sum timber sale, and that a sale prospectus would be available by September *434 15, 1979. Bids would be due on October 15, 1979. This letter also urged interested parties to begin field work as soon as possible due to the probability of very poor weather conditions by early October. As planned, on September 15, 1979, Kavilco mailed the prospectus requesting sealed bid proposals for the sale of approximately 101MMBF of timber (Skowl Arm sale) located on 4,400 acres of its ANCSA grant approximately 40 miles northeast of the subject timber on Prince of Wales Island in the Kasaan, Alaska, area. The prospectus required a minimum bid of $ 18.7 million. Additionally, $ 15 million of the winning bid would be required to be paid in cash at closing. Kavilco cautioned prospective bidders against relying on its estimate of timber volume, as only a preliminary cruise had been performed. Kavilco, therefore, urged bidders to conduct their own independent on-site inspections as Kavilco would not guarantee the correctness of their estimates regarding timber volume and grade distribution. Kavilco did, however, warrant full and complete title to the standing timber on the sale land even though title had not yet been received. Kavilco had been informed that the BLM intended *435 to transfer title by December 1979. The record does not disclose when title was actually transferred. Kavilco attached 43 pages of proposed nonnegotiable contract terms to its prospectus that detailed significant restrictions imposed on the timing and the methods to be employed in the removal of the stumpage. ITT Rayonier (ITT) was the successful bidder for the Skowl Arm sale. A purchase of stumpage generally requires prospective bidders to conduct their own timber cruises, as reliance on a seller's information is reliance at one's own peril. Further, there was evidence that the volume estimates provided in the prospectus were deficient, as Kavilco relied principally on old data that did not rise to the level of a cruise of the property. ITT's effort to prepare a bid began by sending a nine-man timber inventory cruise team from their northwest operations division in Seattle to the site. They arrived the first or second week of September and spent 2 weeks in the field conducting an examination of the sale area. The field cruise was completed by September 19, 1979, and the evaluation of the timber and financial analysis along with several bid options were expected to be completed *436 and ready to submit to top management for approval by October 1, 1979. The following illustrates ITT's conclusion that Kavilco's sampling as to volume had been good but the species distribution was very poor: Kavilco
ITT Rayonier
Spruce
24.8
11.0
Western hemlock
64.8
43.1
Red cedar
10.9
35.8
Alaska yellow cedar
.6
11.9
Pine
--
.8
Total MMBF
101.1
102.6
ITT characterized the quality of this timber as good to excellent with over 80 percent suitable for export. ITT noted that Alaska Lumber & Pulp Co. (ALP) was also cruising the area alongside ITT. ITT felt that ALP would probably be ITT's main competitor for this sale as it was also capable of coming up with the $ 15 million cash requirement. ITT's northwest regional office prepared a 25-page analysis which included maps describing the physical characteristics of the land, such as elevation changes, rock, and water availability. ITT developed the critical volume and grade distribution from its field operations. Its financial analysis included alternative bid amounts that produced ranges of derived rates of return from 3 to 31 percent on discounted investment, given several alternative interest, present *437 value, and cost escalation rates; assumptions regarding log prices; costs of administration; overhead; and logging operations. The regional office submitted a dual bid proposal to the head office in Stanford, Connecticut, on October 2, 1979, and urged that a final decision be made no later than October 12 to allow sufficient time to prepare the final bid along with a 5-percent deposit check by the October deadline. It was also noted that time did not permit a polished report but that most, if not all, of the analytical work had been completed. Several ITT executives noted that although their bid preparation was proper, it had been rushed and required many overtime hours. The recommended and actual bid amounts submitted were $ 22 and $ 24 million. The $ 24 million bid reflected different payment options and an alternative to Kavilco's million cash requirement upon closing. Kavilco received seven inquires to its marketing effort on the Skowl Arm property, but ultimately only four or five sealed bids were submitted, and only two parties showed up at the bid location. The bids revealed that ITT submitted the only qualifying bid. Kavilco chose ITT and further negotiations ensued. *438 ITT's chief negotiator for the Skowl Arm purchase noted the apparent lack of competition. Through negotiated concessions from the $ 24 million alternate bid, ITT was awarded the sale the day following the bid deadline at a final bid price of $ 25.17 million. The final agreement included a reduced rate of interest from Kavilcos 11.25 to 8 percent, as well as an added amendment that allowed ITT the option to extend the harvest term in 1-year increments for an additional $ 100,000 per additional year until December 31, 1990. Both Kavilco and ITT anticipated that title would be conveyed timely for purposes of harvesting, yet ITT negotiated for the waiver of interest until the day after title was actually conveyed. Several strategic considerations led ITT to pursue the Kavilco purchase. ITT was very interested in advancing long-term plans in southeast Alaska and wished to maintain a continuing presence following a prior very profitable initial southeast Alaska timber purchase from Kake Village in 1978. Additionally, ITT felt its present inventory of Pacific Northwest logs was inferior to the southeast Alaska logs, and that the Skowl Arm purchase would expand ITT's export log product *439 line, and would assure ITT a long-term supply of high quality export logs sufficient to sustain operations through 1986. ITT also perceived that the sale would put it in an excellent position for future sales by Kavilco, and would also improve its credibility with other ANC's by providing additional evidence that it was willing to structure timber transactions to meet Alaska native needs. Kavilco's chairman of the board agreed that ITT was able to move very quickly only because it had already made a commitment to expand operations in southeast Alaska. By ANCSA section 4(c)(5), 43 U.S.C. section 63(c)(5), Sealaska, also the regional corporation for Kavilco, conducted a post-sale review of the Kavilco-ITT transaction, and although it did not find fraud or overreaching to the detriment of Kavilco's 24 shareholders, Sealaska did question the advisability of Kavilco entering into an agreement without possessing better and more accurate information regarding the amount of timber it was selling, and given the questionable cruise information, Sealaska also raised concerns regarding Kavilco's knowledge of the worth of the assets it was selling. 2. *440 Shortcominqs of Latham Appraisal
Due to the fact that respondent's expert compared but one timber sale to that of the subject timber, namely, the Skowl Arm sale between Kavilco and ITT, we must initially determine whether we can rely on this singular sale as a sufficient reflection of the market. The parties agree that the Skowl Arm sale is proximately located to the subject timber and that the timber was of export quality, although they disagree as to the specific quality of the logs. Respondent argues that although this sale was but a limited term contract right to cut trees and not a fee sale of timber, when the option is exercised to extend the cutting term, it is of sufficient length to approximate the expected harvest period for the subject timber. Respondent also argues that this sale was well marketed and that, although the seller lacked title upon conveyance, this lack of title was of little consequence to the parties due to the fact that harvesting could not commence until the necessary infrastructure had been put in place. Petitioner argues not only that a solitary sale is an insufficient basis for valuing the subject timber, but that it also is particularly unwarranted *441 where a vast array of market data exists. Petitioner also argues that this single sale is far too different from the subject timber to make meaningful comparative adjustments. For the most part, we agree with petitioner. In terms of size and quantities of timber, the volume of timber involved in the Skowl Arm sale was merely 19 percent of petitioner's Long Island conveyance. Also, although the timber was principally destined for the export log market, it is evident that the Klukwan timber was of significantly higher quality than the Skowl Arm timber. Given the scarcity of private timber sales in southeast Alaska during this time period, we feel that the above differences were quantifiable and appropriate adjustments could have been made. Additionally, the difference in the character of timber ownership (fee vs. stumpage contract rights) and the costs as well as the administrative burdens associated with a stumpage contract also were necessarily quantifiable. However, we feel that the cumulative effect of the above-required adjustments and the recognized similarities between the Washington State export log market and species in the southeast Alaska market required the sample *442 of sales to be expanded to include this supply area. The Skowl Arm sale is particularly disturbing to us due to the manner in which it was conducted. It is clear that several factors contributed to the lack of interest in this sale, including the short lead time allowed to cruise the property and gather the critical information that was not provided to potential bidders in the prospectus, but which is determinative of a property's value and a potential bidder's calculation of a bid figure. Also, the $ 15 million cash requirement was made more onerous given the shortened timeframe. Additionally, the lack of title added to the reasons that potential bidders were dissuaded and competition was ultimately lacking. It is only because ITT was already on the scene, and interested in further Alaska expansion, that it also was not eliminated from the competition which would have left Kavilco empty handed. No other fact reveals Kavilco's board of directors burning desire to raise capital for its needy shareholders more than its decision to sell the Skowl Arm property before it owned such property. This Court can understand a seller urging prospective buyers to cruise and gather information *443 on the property before winter sets in, but we cannot understand why the seller allowed an unreasonably short period of time (30 days from the release of the prospectus to the bid date) for prospective bidders to analyze the information gathered and determine a bid, especially since the seller did not expect to receive title for several months, and in any event, the lack of infrastructure and the oncoming winter weather prevented the possibility of work until the following spring. Given the recognized lack of competition, we do not understand why Kavilco did not exercise its option of rejecting all bids and waiting for a later day to sell the Skowl Arm property. Also, it is clear from Sealaska's review of this sale, and the contract provision which warned buyers not to rely on Kavilco's estimation of timber volume and species distribution, that Kavilco did not possess enough information regarding the worth of the asset it was selling. ITT's much more thorough cruise provided critical information as to species distribution. As the section on log prices will reveal, Sitka spruce and Alaska yellow cedar are much more valuable species than western hemlock or red cedar. Mistakes as *444 to the species makeup of an offering or grade distributions within a species will cause material variations in valuation. We find that Kavilco was principally concerned with raising capital and only secondarily concerned with receiving a fair price for the asset it was selling. That is, the seller was not sufficiently knowledgeable. Consequently, we do not have sufficient confidence in this sale to rely on it singularly. A sufficiently large sample of comparable sales is required to validly reflect the fair market value of the subject timber and to ensure against distortions. Willamette Indus., Inc. v. Commissioner, T.C. Memo. 1980-577. This Court recognizes the difficulties of valuing a property that, due to its rarity, has no or few comparables; however, such difficulties should have led to an expansion of the market search rather than to a limitation on it. Therefore, we will now consider the subject timber from petitioner's principal expert's valuation. 3. Petitioner's Appraisal (Rickard)
Rickard discarded the Skowl Arm sale as not comparable and not reflective of the market, choosing instead to expand his search by analyzing the U.S. *445 fee market for timber. As summarized below, the relationships Rickard found between fee and Stumpage timber sales were incorporated into his analysis by way of a conversion return (C/R) calculation. The C/R method of valuation is unique to timber. Literally it refers to the process of converting timber into logs. It is a crude indication of stumpage value that involves determining the end product (log) price and then converting it back to the value of the standing timber on the stump. The C/R value calculation is accomplished by subtracting the costs of logging -- including an allowance for profit and risk, and delivering the logs into the water alongside a ship -- from end product log prices. The C/R value calculated by Rickard determined the spot market log price for the subject timber on the date of valuation. Rickard then adjusted the subject's indicated spot market price to account for observed market relationships between the spot market for logs and the stumpage and fee markets for the subject timber. [7]
*446 Contrary to respondent's assertions, the C/R method of valuation has not been discredited but rather is an alternative method of valuing timber and an appropriate alternative when we are faced with a situation where there are no comparable sales. Additionally, Rickard did not rely solely on the C/R method of valuation, but due to an insufficient number of private stumpage sales and no fee sales in the subject market, he merely incorporated it as an aid in calculating stumpage and the fee value for the subject timber. Additionally, the C/R method of arriving at market value for timber, properly formulated, is an acceptable valuation technique. Miller v. United States, 223 Ct. Cl. 352, 620 F.2d 812, 825 (1980). The lack of any fee sales in southeast Alaska required that Rickard begin his analysis by examining the market for large fee timber tracts in the United States. He found seven such sales that were executed between June 1979 and December 1980. Five of these sales were scattered throughout the South and two occurred in the Northwest. Rickard analyzed the relationship between the price paid in the market for fee sales and prices *447 that were being paid for the same timber pursuant to the more limited short-term stumpage contracts. Rickard discovered that during this time period, timber purchasers were paying significant premiums for timber sold which conveyed fee ownership rights as opposed to timber sold under the more limiting stumpage contracts. As the fee sales Rickard analyzed were not comparable to the subject in terms of the type of timber or markets involved, Rickard incorporated this market premium into the subject timber's valuation via Rickard's determination of the subject timber's stumpage value. Due also to the existence of only one private stumpage sale in the southeast Alaska timber market during this time period, Rickard's starting place for determining the subject timber's stumpage value began with his determination of the subject timber's spot market price or C/R value. We begin our analysis of Rickard's approach by examining export log prices (end product prices) for the subject timber as well as its operating costs. a. Export Log Prices
Both principal experts analyzed export log sale prices, Latham for purposes of his DCF calculation and Rickard to calculate the subject timber's *448 C/R value. Remarkably, the results are strikingly similar. We are struck by the similarities only because nowhere else in either expert's reports do they agree. The experts used two of the same southeast Alaska export log sales. Rickard analyzed two additional southeast Alaska export log sales, and each expert incorporated additional market log information from different sources. From this raw data and with each sale, each expert determined prices at every grade level for each species, and after weighing the information as each felt appropriate, they determined a representative price for each species at every grade level. Each expert first weighted these determined prices by the stipulated grade volumes within each species given earlier, and the resulting indicated weighted prices follow for each species. These prices were again weighted by the following agreed-upon species volumes, resulting in each expert's final indicated unit log price for the subject timber's total stipulated volume of 539,295 MBF: Agreed Species
Rickard
Volume (MBF)
Latham
Sitka spruce
$ 1,066
172,741
$   990
Hemlock
431
334,116
460
Red cedar
331
31,021
310
Alaska yellow cedar
1,649
1,417
1,710
539,295
Unit log price/MBF
632
625
*449 Upon examination of both experts' analyses of export log price data, we observe that each of their derived per grade and per species prices falls well within the range of individual transaction prices exhibited by the recognized poorer quality of the southeastern Alaska comparables. Respondent disagrees with Rickard's determination that 16 percent of petitioner's timber volume would have sold as lower priced pulp and, therefore, that the remaining 84 percent would be of export quality. Respondent's criticism emanates from estimates indicating higher volumes of pulp for the subject timber that were made by organizations or individuals who did not appear before us. We find no fault with Rickard's determination, as respondent's own expert did not go beyond the stipulated volume indications for utility timber and, therefore, assumed that the percentage of pulp in the subject timber volume was 13.5 percent. Respondent also contends that grade distribution and petitioner's stipulated timber volume reflect the totality of the quality characteristics for the subject timber. We have previously found that the export log industry views log size, length, and taper to be important considerations *450 in determining price. Nissho Iwai American Corp., T.C. Memo. 1985-578. Also, if grade distribution fully accounted for a timber's value in the export market, there would be no need to separate export logs into sorts which further consider these factors. However, respondent is correct in objecting to Rickard's inappropriate use of after-the-fact cutout or harvest information regarding the subject timber when comparing the subject's average log size with that of comparable southeast Alaska sales. While log size can be easily estimated in the forest pursuant to sampling performed upon a cruise of a property, the use of actual harvest data reveals far more accurate information than any cruiser would have developed. Rickard's data reveal highly significant and favorable differences in the average log size of the subject timber when compared with two southeast Alaska sales where such information was available. We find that although a cruise would not have revealed such large size disparities, it would have revealed significant size differences that prospective buyers would have considered in developing bids for the subject timber. See J.J. White Lumber Co. v. Commissioner, 24 B.T.A. 274-275 (1931). *451 Significantly, larger log sizes justify Rickard's determination that the subject timber would have prices at least falling within the upper range of the prices indicated by the comparable log sales. Respondent places strong emphasis on mixed evidence of declining log prices prior to the valuation date as well as evidence of much further declines subsequent to June 5, 1980. We note that each expert's development of log price information was pursued for different purposes: Rickard's log price findings were made pursuant to a determination of a spot market price on a date certain, whereas Latham's log price values were made pursuant to a DCF model requiring the forecasting of future price trends and harvest liquidation periods. We do not find such evidence relevant to Rickard's determination of a spot market price where he utilized price data from three sales that occurred within the same month as the subject valuation date. For the fourth log sale, any minor price fluctuation occurring between this March 1980 sale date and the June 1980 valuation date is necessarily diluted due to the weighting of these sales. Evidence of short-term cyclical market trends such as the lumber futures *452 market, monthly housing start data, and any similar market evidence is also not significant to the determination of the value of a long-term timber investment. Considering the above findings and additionally recognizing the market's perception of the extraordinary quality of the subject timber, on balance we find that the subject timber would have sold as export logs on June 5, 1980, for the unit spot market price of $ 630/MBF. b. Logging Costs
Logging costs for Long Island timber were estimated by each of the principal experts. Rickard utilized USFS regional cost index formulas that represent an average operator's logging costs for southeast Alaska. As this data base is readily adjustable for differing conditions, Rickard made appropriate adjustments reflecting the specific operating conditions given the subject's timber characteristics and location. Both Rickard and Latham reviewed the topography of Long Island using USFS maps and stereoscopic aerial photos, as well as by physical inspection. Additionally, Bill Menish (Menish) was asked by petitioner to submit a report. We are very impressed with Menish's logging career, which began in 1942 and included the titles of *453 foreman, manager, and supervisor of logging for several companies involved specifically with southeast Alaskan timber from 1959 until his retirement in 1987. He also personally examined the subject property in the 1970s before harvest for a potential bidder in anticipation of a possible USFS timber sale. From 1969 to 1987, Menish managed all logging operations for Ketchikan Pulp Co. (KPC). His duties included preparing and submitting annual budgets that were developed primarily from prior years' actual cost experiences in logging and road building. Due to the favorable terrain and volume of timber on Long Island, Menish determined that the subject timber could be logged at the lowest cost estimate/MBF that he had seen in all of his 30 years of logging in southeast Alaska. Respondent again argues that Rickard is improperly incorporating hindsight information, specifically log size information, as part of his logging cost determinations. Given the evidence that log size can be determined from a properly conducted cruise, albeit merely a crude estimate, and the principle that information which is reasonably anticipated or contemplated on the valuation date may be taken into account, *454 we find that petitioner has not improperly considered such information. Cf. J.J. White Lumber Co. v. Commissioner, supra. However, we note that Rickard calculated log size by dividing the volume of timber by the number of logs actually harvested from the subject property. As the actual number of logs on the subject property could not possibly be determined from a cruise, we will not consider the accuracy that such information reveals. Respondent also argues that Menish's report is far too itemized and detailed; however, respondent's own expert estimated that his own logging cost determinations probably included a plus or minus 20-percent error rate. Latham also frankly admitted that he was quite impressed with such detail, no doubt because he failed to incorporate such exactness into his own report by generally estimating costs without reference to the characteristics of the subject timber or terrain. Recognizing that neither of the principal experts has had any direct experience with logging costs but noting that Rickard's estimate is remarkably close to Menish's, [8] we defer to Menish's experience and his June 5, 1980, estimates of logging *455 costs that follow. We will deal separately with all administrative, marketing, profit, and risk cost allowances below as KPC's head office determined appropriate allowances for these costs, whereas Menish was solely responsible for logging costs. The following figures include the total costs associated with all activities and equipment involved at each level of production: Camp, shop, and moving
$ 16.70
Road construction
24.20
Cutting
14.15
Yarding
29.10
Loading
8.82
Hauling
10.23
Sort yard
18.35
Scaling
4.50
Bundle, dump, and raft
19.84
Towing
3.00
Total logging costs/MBF
148.89
Due to the total lack of infrastructure on Long Island, a camp with all necessary equipment and supplies would have to be barged into the area, complete with a shop for the maintenance and repair of equipment, as well as a bunkhouse and cookhouse, to feed and shelter the crew. Road construction involves developing rock pits, hauling the ballast and surface rock material, clearing timber, spreading the ballast and surface rock, and constructing needed bridges. The availability of limestone rock on Long Island is advantageous as it is easy to drill. Also, due to the fee status of *456 the timber ownership, roads can be laid out to the advantage of the logger, provided State and Federal forestry and environmental regulations are followed. Cutting includes felling trees, cutting limbs, and bucking (sectioning) the trees into log lengths that maximize volume and value recovery from each tree harvested. Yarding involves all activities and equipment (cables, winches, and towers) associated with moving the bucked logs from the woods to a roadside landing. Loading and hauling refers to the handling and loading of trees onto trucks and hauling them from the landing to the sort yard where they are unloaded and separated according to species, size, and other quality characteristics. Scaling involves the measuring and grading of logs once at the sort yard. This function is performed by a scaler from an independent scaling bureau to ensure unbiased reporting. Bundle, dump, raft, and tow involves banding the export and pulp logs into bundles, placing them into salt water, and assembling them into export and pulp log rafts. The log rafts are towed to a water storage area and then export logs are towed alongside a log ship anchored just off Long Island for loading into *457 the ship's hold. Pulp logs are sold from the storage area and towed to one of two area pulp mills. c. Additional Costs, Profit, and Risk
The remaining costs were handled differently by each of the principal experts. Rickard defines marketing costs as all expenses associated with the export of logs, including finding a buyer, supervision and quality control over the sort yard, merchandising, log agent's selling commission, invoicing, and delivery free alongside ship. Administrative costs include *458 all expenses associated with engineering, camp, shop and towing support functions, contract administration, office overhead, pulp marketing, travel, and general insurance. Rickard determined marketing costs based on export volume, assuming 84 percent of the timber would be of export quality. See supra p. 31, Therefore, he calculated marketing costs at 84 percent of $ 15/MBF or $ 12.6/MBF. Rickard's determined industry standard allowance for administrative costs and allowance for profit and risk was 5 and 17 percent, respectively, of total logging costs (excluding road costs and marketing). As Menish's calculations are nearly identical to Rickard's, we presume that Rickard gave Menish the appropriate profit and risk, as well as administrative percentages, to incorporate into his report in the same way Rickard gave Menish the volume stipulation and piece (log) size information. Unlike Rickard, Menish's road construction costs do not include an allowance for administrative costs; accordingly, our determination will include such an allowance as a percentage of road costs. Due to Latham's experience in managing large properties, he included a 5-percent commission calculated at *459 his determined gross log price of $ 625; therefore, his allowance for marketing and administrative or management costs was $ 31.25/MBF. In determining these additional management expenses, as well as profit and risk allowances, we feel that Rickard has the appropriate industry experience; therefore, in employing his percentage allocations, we find that all operating costs including the above logging costs total $ 193/MBF, a number which we recognize is very near Rickard and Menish's original figures. Due to Rickard's inappropriate use of detailed after-the-fact harvest cutout information, we feel that an additional $ 7 margin of error is appropriate, bringing us to $ 200/MBF as our finding of total operating costs for the subject timber. d. Conversion Return
Incorporating our findings above, our determination of the subject's spot market price or C/R value is $ 430/MBF. Conversion return is Rickard's initial indication of the subject timber's stumpage value. e. Stumpage Price Increment
In May 1980, the DNR projected a slight dip in export log prices followed by steep and continued price increases over the next 10 years. Industry players joined in this market outlook, *460 which reflected a market that anticipated little change in the long-term demand for export logs but was increasingly concerned with the decreasing supply base of exportable timber. Such concerns proved well founded with Federal export restrictions on DNR and other State timber subsequent to the June 1980 valuation date. Customs and Trade Act of 1990, Pub. L. 101-382, sec. 491, 104 Stat. 719. Contrary to respondent's assertions, we do not believe that the much-needed supply of exportable timber provided over a period of years by the ANCSA conveyances would affect the market significantly. As a C/R value is merely a reflection of end product prices on the date of valuation and indicates only a price of stumpage as if it had been harvested and sold on the valuation date, it does not reflect price or market expectations for the subject timber. Therefore, recognizing timber's historical and projected real price increases over inflation, Rickard attempts to quantify this element of value by analyzing the relationship between actual stumpage prices and his calculated C/R value for the same stumpage sales. To determine additional stumpage market indications for the subject timber and *461 recognizing that only one private stumpage sale transaction occurred nearly 8 months before the valuation date in the southeast Alaska timber market (Skowl Arm), Rickard chose to analyze two much more active although public stumpage markets. Rickard analyzed the public stumpage markets for USFS timber in southeast Alaska and for Washington State DNR timber. He started with a sample of sales that included all 16 southeast Alaska stumpage sales transpiring during the calendar years 1979 and 1980, as well as all 251 DNR transactions occurring approximately 1 year preceding the valuation date. The volume included in the 16 USFS and 251 DNR sales totaled 271,474 MBF and 784,350 MBF, respectively. Rickard appropriately eliminated all sales which exhibited characteristics that were not similar to the subject timber including salvage or blowdown sales, Small Business Administration (SBA) sales that administratively restricted competition, small sales of less than 1,000 MBF, contracts with unusual sale terms or operating conditions, and those sales where less than 90 percent of the timber was conifer. The remaining representative sample of sales consisted of 3 USFS and 64 DNR sales, which *462 totaled 446,465 MBF in terms of volume. The duration of the contract cutting term for the 3 USFS and 64 DNR sales averaged 6 years and 3 years, respectively. After isolating a representative sample, Rickard's procedure for determining the spot market or C/R values for each of these sales began with each agency's (USFS and DNR) presale C/R appraisals. Rickard's analysis started with agency data concerning timber characteristics and operating and manufacturing costs. Due to the fact that these presale C/R appraisals were calculated several months before the bid date, Rickard updated each USFS and DNR C/R appraisals to reflect prices and costs prevailing as of the sale date. Additionally, DNR calculates its presale C/R appraisals assuming that its timber will be marketed entirely in the domestic log market even though such timber is largely exportable. Accordingly, Rickard adjusted the DNR presale C/R appraisals to reflect export log prices and the corresponding costs of export operations by deriving data from the Industrial Forestry Association composite log sales analysis. Rickard additionally analyzed and adjusted the costs of these sample sales in the same manner as he analyzed *463 the subject timber's logging costs by utilizing USFS regional cost index formulas. Comparing Rickard's recalculated C/R values against actual high bid prices for these private stumpage sales, Rickard found that the market was bidding an average of 20 percent above his calculated spot market prices for southeast Alaska USFS sales and 15 percent above his spot market prices for DNR sales when weighted by volume. The following illustrates the above described relationships as well as Rickard's formula, which reflects that Rickard's indicated bid increment above C/R was determined as a percentage of end product log prices: Sale Bid
Stumpage
Sale Bid Increment
Market Operating
Conversion
Sale Bid
Increment
as % of Log Price
Costs
Return
Price Above C/R
Log Price
USFS
$ 566
$ 480
$ 86
$ 202
$ 116
20
DNR
499
135
364
440
76
15
Rickard's data disclose that the majority of the successful bids on these representative sales were made at prices that exceeded their C/R calculation and ranged from 5 to 25 percent of the end product selling prices on the same date. The table also reflects the added manufacturing costs required for *464 USFS stumpage sales. Due to export restrictions, USFS stumpage cannot be sold in round log form and was required to be domestically processed into cants, sawn lumber, chips, or other forest products before sale into export markets. Accordingly, in calculating USFS stumpage spot market prices, Rickard included domestic manufacturing costs in the total operating cost figure, as well as logging costs. Correspondingly, in determining the C/R value for USFS sales, Rickard incorporated processed export end product prices, not prices of export logs. Unlike USFS sales, DNR timber, with the exception of red cedar (a negligible percent of the subject volume), was exportable in round log form. Approximately two-thirds of such DNR stumpage sales were actually made into the log export market. The USFS stumpage sales included the typical southeast Alaska species mix of Sitka spruce, western hemlock, and cedars, whereas the DNR species mix was predominately Douglas fir and western hemlock with some cedars but not much Sitka spruce. DNR stumpage sales accounted for approximately 20 percent of the total Pacific Rim export market. As the Japanese clearly preferred and were willing to pay more *465 for round logs over manufactured wood products, Rickard heavily weighted the above quantified market indications in favor of the DNR stumpage sales as these sales more closely reflected the unrestricted export market for the subject timber. Rickard ultimately incorporated a 15.5-percent demonstrated market stumpage increment over the subject timber's spot market (C/R) price calculated at the subject's log price level ($ 632/MBF), ultimately determining a $ 535/MBF stumpage value for the subject timber (($ 632 X 1.155) - $ 195). The contract terms for public stumpage sales regulate logging, hauling and road building practices, and utilization standards, and include compliance requirements that generate higher administrative and operating costs than for similarly situated private timber. USFS and DNR stumpage sales are "pay-as-cut" contracts requiring a downpayment, the posting of a performance bond to ensure compliance, and the requirement that the timber be paid for prior to harvesting at a $ /MBF unit price. Neither agency charges interest on any unpaid portion of the bid amount during the term of the contract. The USFS contracts may also require the stumpage purchaser to construct *466 roads prior to harvesting, for which the purchaser is given a USFS calculated credit that is applied against the high bid price and calculated on a per unit volume basis. In determining the amount of this credit, the USFS estimates the cash equivalent value it will receive from such construction. The USFS high bid is the total bid price for which the purchaser is responsible. The statistical high bid is the high bid reduced by the road credit equaling the cash consideration required from the purchaser. The purchaser in essence is purchasing the USFS stumpage with cash and an obligation to build roads for which he is given a predetermined road credit. Respondent contends that this Court should require Rickard to incorporate the statistical high bid in his formula instead of the high bid which improperly includes the value of roads. However, petitioner has shown us that Rickard's analysis is unaffected, and his bid increment remains unchanged, whether respondent's preference for the statistical high bid is used and road costs are included as part of operating costs, or whether as Rickard has chosen, road costs are reflected in the high bid amount. Road costs must be considered *467 as part of Rickard's stumpage analysis and, given his formula, it makes no difference on which side of the equation they are considered. Respondent additionally finds fault with Rickard's incremental formula as it is calculated as a percentage at the log price level which has the effect of increasing the subject's C/R value by 22.4 percent instead of by Rickard's 15.5-percent increment. Rickard's formula was formulated at the log price level; therefore, it must be applied at the log price level. It would be inconsistent to apply this increment to the C/R price or at any other level. Petitioner has also shown us that when Rickard's increment is measured at the log price level, it is more consistent and less variable than if measured against any other factor in the formula or as dollar increments. Additionally, as log or end product prices are the largest figures analyzed in Rickard's formula, it necessarily follows that results derived at that level will exhibit the lowest variance rates and result in the most reliable information given Rickard's formula. Recognizing that valuations can never be subjected to the exactness of a science and the peculiar difficulties generated by *468 this valuation given the lack of true comparables, we find that although Rickard's analysis is not perfect, it is conceptually sound. Respondent argues that a positive bid relationship is a foregone conclusion as the USFS minimum bid is the price below which a sale cannot occur. Petitioner reminds us that negative bid increments were found in individual sales and that an overall negative bid increment would be found during a pessimistic market. This Court has noted that USFS stumpage bid prices generally exceed their C/R appraisals especially in an inflationary economy. In this context, the Court's concern has focused on the possibility of undervaluation using the C/R method. Willamette Indus., Inc. v. Commissioner, T.C. Memo. 1987-479. Consequently, it becomes very important to consider the anticipated marketplace where the subject timber will be sold. Rickard's short-term stumpage analysis seeks to measure the market's perception of the near future, whereas the C/R is only a spot market price. It is clearly evident from this record that prior to the conveyance of the subject timber, the southeast Alaska timber "market" consisted of very few *469 USFS stumpage sales and private stumpage sales were virtually nonexistent. However, the southeast Alaska private stumpage market was exploding with ANCSA conveyances. Given these facts, Rickard attempted to measure what could not be accounted for in a C/R calculation, viz, the market's perception of a newly created supply of private timber that would not be restricted by a domestic processing requirement. Rickard expanded his examination to include the export log market that would closely approximate the market forces expected to occur with the subject timber, Washington's DNR stumpage market. The log prices for the 64 representative DNR sales range from a high of $ 791 to a low of $ 386, averaging $ 482, whereas the USFS southeast Alaska sales when expanded to include three SBA sales reflect a high log price of $ 672 and a low of $ 456, resulting in an average log price $ 110 higher than the DNR sales. While prices in southeast Alaska were on average higher than for DNR sales, costs were also higher, averaging $ 336 more than for DNR sales, due largely to the domestic processing requirement. As a result, the bid prices on DNR's sales average $ 226 higher than in southeast Alaska. *470 We find further support in Rickard's stumpage analysis that our prior finding of log price is fully compatible with demonstrated log prices in Alaska, and that our costs expectedly exceed DNR sales but are consistent with the absence of the USFS processing requirement. Respondent requests that we also consider that public contracts do not carry the risks of quality and quantity estimation errors inherent in private stumpage sales, as to which we agree with petitioner that a proper cruise allows for such risks, as evidenced by the ITT cruise of the Skowl Arm property, and the costs associated therewith have previously been considered in the marketing and risk allowances. Respondent contends that Rickard's stumpage increment reflects the benefits of interest-free payments on a "pay-as-cut" basis over a period of years, and once proper adjustments to reflect a cash equivalent price are made, Rickard's increment disappears. Petitioner's argument that a cash equivalency adjustment is not required due to an insignificant correlation between the stumpage bid increment and the duration of the contract term has failed before. Willamette Indus., Inc. v. Commissioner, T.C. Memo. 1987-479. *471 Petitioner's additional argument that such adjustments have never been required in valuing stumpage contracts by the industry or State taxing authorities also does not persuade us. Petitioner argues that the added costs of complying with the many administrative burdens delineated in public contracts more than offset any benefit derived from the lack of interest charges; therefore, such public sales reflect a conservative estimate of the value of private timber. This Court has previously recognized that costs are generally higher with public stumpage contracts due to the red tape involved that is not present in private stumpage contracts. We have also noted that the appropriateness of a particular comparable is determined by the characteristics of the timber being valued, not the identity of the seller; consequently, public and private timber sales can be compared in determining fair market value provided they exhibit similar qualities. Willamette Indus., Inc., T.C. Memo. 1980-577. Additionally, we have recognized that when comparing public and private stumpage, differing contract terms, namely, the existence of an interest provision or the lack *472 thereof which materially affects a valuation, must be accounted for by appropriately discounting the public contract indications. Willamette Indus., Inc. v. Commissioner, T.C. Memo. 1987-479. Considering that public stumpage contracts enjoy the benefit of interest-free existence and that petitioner did a better job of incorporating appropriate terms that reflect the essence of such contracts into a present value calculation, and additionally weighing the added burdens and administrative costs involved in complying with public contracts, we find that Rickard's analysis reflects more than the lack of an interest term. Therefore, on balance we find that a conservative market would have bid 8 percent over the subject's C/R log price, and it is appropriate to adjust the subject's C/R price to reflect its value as stumpage at $ 480/MBF (($ 630/MBF X 1.08)-$ 200). f. Large Fee Tract Increment
In quantifying the market's desire for fee timber, Rickard analyzed the purchases of seven large (relative to area sales) tracts of fee owned timberlands during 1979 and 1980; five were located in the South and two in the Pacific Northwest. Respondent provided *473 two additional experts, each knowledgeable in one geographic region. L. Keville Larson (Larson), president of Larson and McGowin, Inc., has over 30 years' experience as a southern forestry consultant in Alabama. He was aided in his report by three staff members, each of whom holds advanced degrees or degrees attained with honors. Larson's firm investigated each of the five southern sales by consulting foresters, representatives, and advisers to the buyers or sellers, as well as other individuals knowledgeable in the field or by drawing on first-hand knowledge of the properties and, in some cases, by actually visiting the tracts. Rickard's data for the five southern sales were gathered from the original studies of two southern appraisers with whom he was acquainted. Both of these individuals had been personally involved in these sales as either appraisers or cruisers inventorying the properties. Rickard extensively consulted with each and independently verified some of their analysis but ultimately incorporated the totality of their results into his report. Both of these appraisers documented that the five southern fee sales of timberland sold for premium prices above comparable *474 sales of short-term stumpage by comparing actual price data for short-term stumpage sales that were proximately located to the fee sales and in which they also had actually participated. For the sales below, Rickard and Larson found the following premiums expressed as percentages: Date
Seller
Buyer
Location
Rickard (%)
Larson (%)
6/79
Amax
Georgia Pacific
South
11
11 8/79
Bodcaw
Intl. Paper
South
9
8 11/79
Woodward
Willamette
South
9
7 10/80
Intl. Paper
Evergreen
South
27
0 12/80
Georgia Tim.
Travelers
South
25
11 10/80
Milwaukee
Potlatch
Idaho
30
n/a
10/80
Milwaukee
ITT
Washington
32
n/a
Each sale included not only timber but also other assets such as land, saw or pulp mills, equipment, and minerals. The purchase price was first allocated among the different assets purchased. The accuracy of such allocation directly affected the results derived. In quantifying the price differential between fee timber and the same timber if sold as short-term stumpage, Rickard and Larson compared the purchase price that had been allocated to the fee timber account to a determination of what the same timber was selling for in the same location as short-term *475 stumpage. Except for the following discussion, petitioner does not dispute the minor differences in premiums observed by Larson for the first three sales; therefore, we find Larson's figures to be as accurate as this type of information allows. Regarding the Bodcaw sale, Larson found that Rickard had not recognized the value of 75,000 premerchantable plantation acres. Although it appears that Rickard's report did consider such acres as part of the forest land, petitioner did not endeavor to ask Rickard; therefore, as we do not find it obvious, Larson's premium determination respecting the Bodcaw sale is more persuasive than Rickard's. Both experts agree that this was a landmark sale that was highly publicized and which generated intense competition between two major industry players, Weyerhaeuser and International Paper, each trying to keep the other out of its backyard. Ultimately, we will give this sale added weight due to our finding that it would closely approximate the intensity of competition between major industry players that we would expect to have occurred had a sale of the subject property actually taken place. Regarding the International Paper-Evergreen Timberlands *476 transaction, Larson also determined that when premerchantable plantations were valued as a separate component, the perceived premium disappeared. Here again, as this determination goes unchallenged, except on brief, petitioner has failed to rebut it. Similarly, Larson accounted for 14 percent of Rickard's premium in the Georgia Timberlands-Travelers transaction by again separating the value of premerchantable plantations from land and by recognizing that Rickard had apparently failed to consider the value of 1,000 acres of cropland. Harold F. Anderes (Anderes) of Roseburg, Oregon, is a western timber consultant, retired from a career of logging in California and Oregon. While Anderes is a registered professional forester, he appears to have drawn his authority and appraisal experience principally from one continuing education course. Anderes had not inspected the subject property or any of the properties he analyzed for respondent. Anderes' very limited and simplistic analysis is not helpful as he did not attempt to isolate the critical short-term stumpage to fee relationship, but instead attempted to develop a relationship between the actual purchase price and a cruise valuation *477 (which is not an appraisal) or between the actual purchase price and his unsubstantiated and undescribed valuation. We will not look further at any of Anderes' alleged discounts as his testimony at trial further indicated to us that he did not understand Rickard's analysis. Respondent makes numerous arguments against an upward value adjustment for the fee element of the subject timber. At the outset, we note that respondent's own expert, Latham, recognized the existence of such value but did not attempt to quantify it, instead choosing to offset such value against his further determination that the large size of the subject tract would precipitate an equivalent downward and offsetting adjustment. Respondent advances the position that the alleged value found in Rickard's supposed premiums is not attributable to the timber at all but to the land or, alternatively, that such indications are due to strategic advantages perceived by a particular buyer which are intrinsically valuable only to that particular buyer and are not a value inherent in the timber or a hypothetical sale. We find little value attributable to the land upon which the subject trees grew for the simple reason that *478 once they are harvested, such land has little value and will not produce trees of this size for over 160 years, a period too distant to recognize a quantifiable element of value in the land. Respondent adds that any demonstrated premiums in Rickard's southern sales are most likely related to a growth factor resulting from the South's fast growing timber or to significant volumes of immature stands of growing timber. Given Rickard's and Larson's combined determinations regarding the southern sales, we feel that any value associated with premerchantable stands of growing timber was adequately accounted for in the purchase price allocations. We also note that the rotation period for merchantable southern timber is much shorter than that for the subject timber. Therefore, any growth factor applicable to the southern sales was properly accounted for, and there is no value element associated with further growth in the subject timber as it is a mature stand. The value of the subject timber should include an added increment of value for the fact that fee ownership as opposed to any other form of timber ownership possesses definite demonstrated benefits, of which all knowledgeable buyers *479 would be aware. We also find that a properly marketed hypothetical sale of the subject timber would create intense competition among the major market players, who would all find the subject timber a rare and increasingly scarce contiguous offering of uncommon size in terms of timber volumes and quality. Larson himself recognized the heightened interest in the South during 1979 to 1980 in the acquisition of large fee holdings due to the scarcity of such offerings. Respondent reminds us that the timber species and markets of the South differ vastly from the subject timber species and the "undeveloped" market of southeast Alaska; consequently, any premium determinations are not comparable and cannot be used as indications of the value of the subject timber. We note that the sales analyzed by Rickard involved several major industry players, many of whom have significant timber holdings throughout the world. We add that respondent's characterization of southeast Alaska as an emerging and "undeveloped" market misses the mark. The Pacific Rim export market is the relevant market; the southeast Alaska conveyances merely added a much needed supply to an already well-established and existing *480 market. This result leaves us with the first five premium indications determined by Larson and the last two Milwaukee premiums determined by Rickard (see chart at beginning of this discussion, supra p. 50). This exercise has also given us some appreciation not only for the difficulties each expert had in quantifying this element of value but of the subjectivity involved at each stage of the analysis beginning with the allocations of value made among various assets purchased to the determination and adjustment of area stumpage prices for similar timber. The reliability of each analysis was directly related to each expert's success in acquiring information. We generally found a buyer's allocation of value to be more reliable than the seller's due to the fact that a buyer is more likely to pursue the most accurate cruise information as he carries the risk of paying more for an asset than it is worth. Also, not only did Rickard attempt a difficult value quantification of a recognized market phenomenon, but he also supported this quantification with market data, and the market's perception of this value element as seen through the eyes of industry players who recognized such value *481 usually by merely adding a percentage increment to their bids for the added fee value. We feel on balance that a purchaser could be expected to pay a 10-percent premium for fee timber above the short-term stumpage value for the subject property. The results achieved by the two experts may be summarized as follows: Latham
Rickard Kavilco (Skowl Arm)
$ 202.93 Log price- -Klukwan
$ 632 stumpage price
Klukwan's better logging
Plus stumpage price
conditions
9.00 increment (632 X .155)
98 Less operating costs
(195)
Klukwan's richer species
60.00 Stumpage value
535 Downward market trend
(20.30)
Plus fee adjustment
(535 X .175)
94 Unit price/MBF
$ 251.63 Unit price/MBF
$ 629 Unit price multiplied by the agreed volume of 539,295 MBF
Expert's fair market value
$ 135
$ 339
million
million
Considering the voluminous record in this case, the serious efforts at valuation by the parties, which we acknowledge, the difficulty of the subject matter, and recognizing that our ultimate determination of fair market value is our informed judgment, based upon many relevant facts which cannot be individually quantified, we *482 conclude that the fair market value of petitioner's Long Island timber on June 5, 1980, is arrived at as follows: Log price
$ 630 Plus stumpage price increment (8%)
50 (630 X .08)
Less operating costs
(200)
Stumpage value
480 Plus fee increment (10%)
48 (480 X .1)
Unit price/MBF
528 Times agreed volume 539,295 MBF
Fair market value of Klukwan's timber -- $ 285 million
B. Other Issues Pertaining to the Net Operating Loss
1. For the years 1987 and 1988, respondent determined that environmental taxes in the respective amounts of $ 12,648 and $ 22,973 were owing. Respondent, however, made no assessment of tax for 1987. No other issues being presented, this appears to be a computational matter that depends upon the amount of net operating loss coming into the years 1987 and 1988 as the result of our decision on the main issue in this case. Accordingly, the matter should be resolved by the necessary computation under Rule 155. 2. The Investment Tax Credit
For 1986, respondent determined that there was a large unused investment tax credit available to petitioner, but for the years 1987 and 1988, respondent determined that taxes were *483 owing due to recapture of the investment tax credit, $ 552 for 1987 (for which no determination of deficiency was made) and $ 1,193 for 1988, which entered into respondent's total computation of deficiency that was determined for the latter year. Here again, the correctness of these determinations will depend upon the computation which is necessary under Rule 155, as the result of our determination of the principal issue in this case. II. The Alternative Minimum Tax
By amendment to the answer, respondent alleged that petitioner was liable for alternative minimum tax for the year 1988. Although the Court agrees that the matter of liability for the alternative minimum tax for ANC's is the same as for any other corporation, and therefore that the alternative minimum tax provisions potentially would apply to this petitioner, Chugach Alaska Corp. v. United States, 93-2 USTC par. 50,415 (D. Alaska 1993), it is still a computational matter in this case and will be resolved by the necessary Rule 155 computation that will ensue here, see King v. Commissioner, T.C. Memo. 1993-160. III. Net Operating Loss Carrybacks *484 In making a determination of deficiency for this petitioner for 1988, respondent determined that the last of petitioner's available net operating loss carryforwards was applied in 1986, and that no net operating loss carryforwards were available under section 172 to absorb petitioner's income as otherwise determined by respondent for the years 1987 and 1988. Respondent apparently made no audit of the years 1989 and later, and made no determination that any net operating loss carryback was or was not available to petitioner for years after 1988. In its petition herein, petitioner alleged error on the part of respondent in not allowing net operating loss carrybacks to petitioner, at least for the years where respondent had determined that petitioner had net taxable income, before the application of any carrybacks. Section 172(a) provides as follows: There shall be allowed as a deduction for the taxable year an amount equal to the aggregate of (1) the net operating loss carryovers to such year, plus (2) the net operating loss carrybacks to such year. For purposes of this subtitle, the term "net operating loss deduction" means the deduction allowed by this subsection.
Petitioner *485 argues vigorously that, as an ANC, it should be allowed to carry back its net operating losses to prior years within the limitations provided by the statute. Respondent argues vigorously to the contrary. Section 172(b)(1)(A) provides in general that a taxpayer's net operating loss for any taxable year can be carried back to the preceding 3 years and thereafter shall be a carryover to each of the 15 taxable years following the taxable year of the loss. While we might be inclined to agree with the proposition that an ANC should be just as much entitled to carry back its net operating losses as anyone else within the scope of section 172, see Chugach Alaska Corp. v. United States, supra, we do not have to decide that point here. We may concede that petitioner properly alleged error on the part of respondent in its petition in the failure to allow net operating loss carrybacks from years after the ones under audit in this case. We will allow that this was satisfactorily done as an assignment of error under the provisions of Rule 34(b)(4). However, it was further incumbent upon petitioner under Rule 34(b)(5) to go forward and provide the Court *486 with "Clear and concise lettered statements of the facts on which petitioner bases the assignments of error". The petition herein indeed had a number of concise factual allegations supporting various errors that petitioner claimed respondent to have committed, but nothing was said to allege any net operating loss carrybacks into 1988 or earlier years, either in general or as to the amounts thereof that petitioner was claiming. Furthermore, no evidence was presented at trial concerning the existence of any net operating losses for years after 1987 which could have been carried back into years as to which respondent determined there was either a deficiency of tax or untaxed income, viz, 1986, 1987, and 1988. All that the record contains are copies of petitioner's returns for 1989, 1990, and 1991. These do not prove the existence of losses in those years. Tax returns are not self-proving. Halle v. Commissioner, 7 T.C. 245 (1946), affd. 175 F.2d 500 (2d Cir. 1949). Petitioner had the burden of proof to show that there were net operating losses that could be carried back into the years involved in this case, and the amount *487 thereof, Rule 142(a), but it has failed to do so. Accordingly, we must hold that petitioner has failed in its burden of proof to show the existence of any net operating losses that can be carried back from years after 1988. IV. The Spring Back Dispute
Section 60 of the Deficit Reduction Act of 1984 (DEFRA), Pub. L. 98-369, 98 Stat. 494, 577, tightened the definition of an "affiliate" for the purpose of determining which corporations have the privilege of filing consolidated returns pursuant to section 1504(a)(2) of the Code by adding an 80-percent value test to the already existing 80-percent voting test. An exception that was set to expire prior to 1992 was granted to ANC's. Congress clarified its original intent regarding the exception granted ANC's by amending DEFRA section 60 above, with section 1804(e)(4) and (5) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2801, which provided that the section 1504(a) definition of an affiliated group as defined before the above amendment would apply to determine affiliation where an ANC was concerned, and further that no provision of the Internal Revenue Code of 1986 would apply to deny the benefit or use of *488 losses incurred or credits earned by an ANC to an affiliated group of which the ANC was the common parent. This amendment precipitated the sales here of net operating losses by petitioner to taxable entities. Pursuant to the special statutory authority that we have described, petitioner in 1986 and 1987 undertook to "sell" certain of its losses that it had carried forward from prior years to offshoots, known as Drexel L.P. and Snowball, of outside profit-making corporations; namely, Drexel Burnham and Disney. For 1986 and 1987, respondent and petitioner (but not Drexel Burnham or Drexel L.P.) entered into a closing agreement as to how the resulting income from such sale of losses by petitioner to Drexel L.P. would be treated in Klukwan's returns. This closing agreement was further fortified by a stipulation herein. With respect to the income assigned to Snowball and reported in petitioner's 1987 consolidated return, there was no such agreement. Respondent, however, allowed a deduction of $ 109,999,721 in the case of Snowball, as a deduction from Klukwan's reported consolidated income for 1987. Nowhere in all of this was there any determination of additional income against *489 Klukwan for the year 1988, which was the only year for which a deficiency of tax was determined herein, nor was there any addition to income for any year prior to 1988 resulting from these transactions which affected any of the net operating loss carryforwards that Klukwan had claimed. Instead, deductions from income for 1986 and 1987 were determined by respondent, on the basis that the income that Klukwan had reported from the sale of its net operating losses in these years was either governed by the agreement between the parties or was taxable "to the companies which purchased the net operating losses and/or credits" (unnamed). Section 6211 defines a deficiency of income, estate, and gift taxes imposed by subtitles A and B and excise taxes imposed by chapters 41, 42, 43, and 44 of the Code. If the Secretary determines that there is a deficiency of the taxpayer's income tax for any given year, he is authorized to send the taxpayer a notice of such deficiency, sec. 6212. If the taxpayer is aggrieved by the action of the Commissioner with respect to a given year, the taxpayer may file a petition for redetermination of such tax with this Court, and the proper filing of such *490 petition with us is jurisdictional. Brown v. Commissioner, 78 T.C. 215 (1982); Smetanka v. Commissioner, 74 T.C. 715 (1980). This Court has jurisdiction over a year only where the Commissioner has determined a deficiency or addition in the tax for such year, sec. 6213(a); Abrams v. Commissioner, 84 T.C. 1308 (1985), affd. 787 F.2d 939 (4th Cir. 1986), or where the income of another year may affect the tax for the year before the Court, sec. 6214(b); Cleveland v. Commissioner, T.C. Memo. 1983-585. That gives this Court jurisdiction over the deficiency of tax that respondent has determined in this case for the year 1988, as well as the accumulated net operating loss carryforwards from the years 1977 up to 1988, since those net operating loss carryforwards from prior years may have an effect upon the tax that is owed for the year 1988 which is before this Court. The problem is that the deficiency respondent has determined for the year 1988 herein is not affected in any way by the treatment which respondent has afforded to the income *491 that petitioner reported from the sale of losses which respondent determined that petitioner no longer had to sell. Petitioner reported income from such sales, and respondent took it out of income by way of granting a deduction. We do not have before us a taxpayer to whom such income was attributed, with a deficiency developed against that other taxpayer; what we have here is a case where respondent has determined a deduction from income in the case of this petitioner. Determining a deduction from income is not the basis upon which a deficiency of tax is determined, which in turn leads to a notice of deficiency, which in turn leads to a petition before this Court. We do not have before us the unnamed taxpayer to whom respondent might wish to attribute the income that she has taken out of petitioner's income; accordingly, we have no jurisdiction to redetermine a deficiency against such other taxpayer, whoever it may be. All we have is the present petitioner, to whom deductions were granted for a year not directly before this Court. We conclude that the propriety of respondent's actions in this regard does not present an issue which is properly before this Court, and will therefore *492 refuse to consider it. Decision will be entered under Rule 155. Footnotes
*. Brief amicus curiae was filed by Gerald A. Kafka, Martha J. Talley, and Rita A. Cavanagh as attorneys for Sealaska Corp. and Afognak Native Corp.↩
1. Petitioner has partially conceded respondent's adjustment for 1986.↩
2. Although originally disputed by the parties, the volume and grade mix of petitioner's timber have now been stipulated, as we have shown above.↩
3. For certain years, petitioner's computed and claimed depletion was not made on the basis of its original valuation of $ 134,551,800.↩
4. Although originally placed in issue, the parties have settled the inventory writedown issue.↩
5. No adjustments to petitioner's claimed net operating losses were made for years 1977 through 1981.↩
6. These figures are more than petitioner claimed as depletion deductions on its returns, in many cases. Respondent no longer supports these figures but apparently has abandoned them in achieving her claimed fair market value herein.↩
7. For purposes of valuation, we ordinarily do not consider relationships among differing markets; however, given the unique circumstances herein, and the absence of sufficient comparables, as well as alternatives, we find that such analysis is necessary.↩
8. We note such similarities in estimated costs curiously only in the same way we note that respondent's primary expert's opinion of value nearly matches that of petitioner's initial valuation even though both used very different methods of valuation and they were derived from different data sources. Accordingly, we give petitioner's initial valuation no corroborative weight as to respondent's valuation, and in the same way we do not give Rickard's logging cost estimates corroborative weight as to Menish's estimates.↩